## Commonwealth *vs.* Roland Douglas Phinney, Jr.

Suffolk. December 6, 2005. - March 6, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Constitutional Law,* Assistance of counsel. *Due Process of Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel, New trial. *Evidence,* Exculpatory, Police report.

A Superior Court judge did not err in granting the criminal defendant's motion for a new trial based on ineffective assistance of counsel, where the defendant's trial counsel was seriously inattentive in failing to review certain police reports, and this inattention deprived the defendant of two grounds of defense, in that the defendant's trial counsel could have used the information in the reports to show that a third party might have committed the crime [162-165], or to raise a reasonable doubt as to the defendant's guilt by showing that the police failed adequately to investigate the crime [165-166]; moreover, the judge did not abuse her discretion in granting the motion, despite the fact that the defendant had confessed to the crime, where at trial, the defendant had challenged the voluntariness of his confession [166-168].

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on September 17, 2003.

The case was heard by *Sosman,* J.

*David W. Cunis,* Assistant District Attorney, for the Commonwealth.

*David R. Yannetti* for the defendant.

Ireland, J. Pursuant to her gatekeeper function, G. L. c. 278, § 33E, a single justice of this court allowed the Commonwealth to appeal from an order of a Superior Court judge granting the defendant's motion for a new trial based on ineffective assistance of counsel. The Commonwealth argues that the motion judge erred because the defendant did not meet his burden to demonstrate counsel's ineffective assistance where the third-party culprit evidence the defendant seeks to introduce at a new trial would largely be inadmissible and, in any event, would have made no difference in the outcome of the trial. Because

we conclude that the motion judge did not commit an error of law or other abuse of discretion in concluding that defendant's counsel was ineffective, thus depriving the defendant of an otherwise available substantial grounds of defense, we affirm the decision of the motion judge.

*Background and procedure.* The details underlying this case are set forth in *Commonwealth* v. *Phinney*, 416 Mass. 364, 365 (1993), which affirmed the defendant's conviction of murder in the first degree based on extreme atrocity or cruelty and deliberate premeditation.

On February 8, 1980, the victim, who resided at 25 South Walker Street in Lowell, was beaten to death in her apartment, suffering multiple blows that caused massive head injuries. *Id.* at 365. Relevant to the issue before us is that the victim's wounds could have been caused by a blunt instrument with a rounded end, like a club; the victim could have been attacked after 11 P.M.; and there likely was blood on the perpetrator's clothing.

The defendant was a suspect in 1980, but the murder remained unsolved until 1989, when the defendant confessed to the police following a long interrogation. The defendant, who lived next door to the victim, stated that he entered the victim's apartment while she was sleeping and began pulling her underwear down so that he could take pictures of her vagina. When she awakened, the defendant beat her with his camera. *Id.* at 365. The defendant also stated that he washed the blood off the camera, and when police retrieved it pursuant to a search warrant some nine years later, no blood was found on the camera. *Id.* at 365, 367, 373.

At trial the defendant's defense was that his confession, which had been reduced to writing, was not voluntary. An expert for the defense testified that the defendant was of limited intelligence, and accordingly, some of the words used in the confession could not have been used by the defendant. Defense counsel emphasized the length of the interrogation that preceded the defendant's confession and argued that the testimony of an interrogating detective was unreliable in its near perfect recall of seemingly every move the defendant made during the inter-

rogation and confession. The defendant's mother also testified, providing the defendant with an alibi for the time of the murder, and defense counsel stressed that there was no evidence linking the defendant to the crime.[1] In addition, defense counsel pointed to potential third-party culprits seen on the night of the murder: two unidentified men in downtown Lowell, one with blood on his T-shirt, who asked a motorist for a ride to a hospital; and an unidentified man, who was with the victim's roommates and who was seen arguing with the victim outside her apartment.[2]

In November, 2002, represented by new counsel, the defendant filed a motion for a new trial arguing, in relevant part, that his trial counsel furnished constitutionally ineffective assistance because he failed to introduce at trial evidence implicating another man, Mark Barger, as the victim's killer. The defendant further argued that this evidence, which was contained in police reports, also established police failure to investigate Barger. A Superior Court judge who was not the trial judge allowed the motion, later granting the Commonwealth's motion for reconsideration and request for an evidentiary hearing. After conducting the evidentiary hearing, in a written memorandum of decision and order dated August 31, 2004, the motion judge denied the Commonwealth's motion for reconsideration and let stand her previous decision allowing the defendant's motion for a new trial based on ineffective as-

---

[1] Concerning the other evidence in the case, "There was expert testimony that the defendant's camera with flash attachment was capable of inflicting the blows that caused the victim's death. There was also evidence that: (a) the defendant knew the victim's roommate had left the house at about 8:30 P.M. the night of the murder (thus suggesting that the victim would be alone); (b) the victim had no boy friends (thus suggesting that someone other than an angry male friend had killed her); (c) that burglary or robbery was not a motive (a pocketbook with cash in it was left near the victim's bed); (d) the police had information that the defendant previously had entered the victim's home and stolen women's underwear; (e) the defendant had a propensity to take photographs of women wearing short dresses, 'hot pants' or low-cut blouses; and (f) the defendant had taken photographs of women in the neighborhood while they were sunbathing. Additionally, the defendant's written confession contained details pertaining to the murder which would have been known only to him . . . includ[ing] . . . the likely color of the victim's nightgown." *Commonwealth* v. *Phinney*, 416 Mass. 364, 373 n.6 (1993).

[2] Trial counsel also elicited from one of the victim's roommates that male friends of the roommates were in and out of the apartment frequently.

sistance of trial counsel.[3] The Commonwealth sought leave to appeal.

*Discussion.* 1. *Facts relevant to motion for a new trial.* Under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), a judge may allow a motion for a new trial "if it appears that justice may not have been done." Because the judge who acted on the defendant's motion for a new trial was not the trial judge, deference is owed only to the motion judge's assessment of the credibility of witnesses; this court is in "as good a position as the motion judge to assess the trial record." *Commonwealth* v. *LeFave*, 430 Mass. 169, 176 (1999), quoting *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). We note that, here, the issue depends on evidence presented at the hearing on the motion for a new trial, which we now set forth. See *Commonwealth* v. *Grace, supra.*

Over one year after the murder, in April, 1981, a Lowell police officer, Lawrence Hickey, and his partner responded to a report of harassing telephone calls and a "Peeping Tom" at 104 South Walker Street. One of the residents, Carol Fortin, indicated to police that her estranged husband, Mark Barger, could have been making the calls and that she suspected a link between her husband and the murder victim, whose apartment was also located on South Walker Street. We set forth the motion judge's summary of the three reports Hickey wrote in response to the conversation he had with Fortin,[4] which is fully supported in the record:

> "Regarding Carol Fortin's and Mark Barger's marriage, the Hickey reports indicate that Barger had been very unstable and Fortin was still afraid of him in April 1981. Barger had struck and threatened Fortin numerous times during their marriage and by the end of 1979, Barger had become increasingly violent and moody. On January 27,

---

[3]It appears from the docket that the defendant's present counsel first made an appearance after the defendant filed his motion for a new trial, but prior to the motion judge's August 31, 2004, memorandum of decision and order on the Commonwealth's motion for reconsideration.

[4]Although there were three reports, containing varying amounts of detail, it is not necessary to identify which report contained the information to which the motion judge and this opinion refer.

1980, Barger attacked Fortin with an axe handle. Subsequently, she sought treatment from a psychiatrist, who, after meeting with Barger as well, advised her to separate from him because he could potentially be dangerous and might hurt Fortin or their children. On February 7, 1980, [the day before the murder] Barger was scheduled to see the psychiatrist again, but failed to keep his appointment. The report also describes Fortin's account of Barger's activities on the night [the victim] was murdered: 'Mark left for work at Pandel where he worked the 3 P.M. to 11 P.M. shift. Carol stated that Mark walked home from work in the evening and that he carried a club (she described it as "sort of a billy club") for his protection. Carol says that Mark did not get home from work that evening until 4 A.M. and that when he came home she waited a short while and when she could no longer hear him moving she left her bedroom to check on him. At this point she found him sleeping on the couch and that his work clothes were in the washing machine being washed. (Carol states that her husband had *never* washed his clothes after work) (emphasis in original) . . . he said that he had gotten dye on his clothes at work . . . later that day after reading of the [victim's murder] Carol said to Mark "isn't it too bad about that girl" to which Mark replied "she probably deserved it." At this point Carol says she made reference to the girl's character as portrayed in the paper and Mark replied "she wasn't the goody two shoes they make her out to be." ' Also, the report states that 'Carol does not know what became of Mark's billy club' and that 'a neighbor [Ruth Montbleau] also stated that she believes Mark "knew some of the girls from the college." '[5] Finally, the reports state a suspected link between Barger and [the victim's murder]: '[Fortin] although visibly upset and apparently terrified of Mark has agreed to talk to Insp. [Larry B.] McGlasson [of the Lowell police department] . . . about any possible connection between her husband's erratic behavior and the [victim's murder].' "[6]

The motion judge concluded that these reports were sent to

---

[5] The victim and some of her roommates had been college students.

[6] The judge found these police reports to be credible, despite Fortin's testimony and affidavit (discussed *infra*) contradicting some of the facts.

the defendant's trial counsel[7] and found credible trial counsel's testimony that he never saw them. In September, 1993, Hickey read about the defendant's appeal from his conviction, visited trial counsel, and told him about the reports.[8] Trial counsel wrote a letter to the defendant's parents advising them of the visit and telling them that the information "is not enough for a new trial." He also asked Hickey to accompany his investigator when the investigator went to speak with Fortin, who was still living at 104 South Walker Street. The judge found that, according to Hickey, Fortin disavowed the information in the reports because she did not want to revisit her life with Barger.

The defendant's motion for a new trial was filed by new counsel. It was accompanied by three affidavits, one by Hickey, one by the neighbor mentioned in Hickey's police reports, and one by a private investigator hired by one of the defendant's postconviction attorneys. Fortin also submitted an affidavit, which accompanied the Commonwealth's opposition to the defendant's motion.[9] Testifying at the motion hearing were Fortin; the defendant's trial counsel; one of the defendant's postconviction attorneys; Hickey; and McGlasson.

We set forth the motion judge's summary of Fortin's testimony, which is fully supported in the record:

In addition, at the hearing, Hickey testified that McGlasson arrived to interview Fortin. Fortin testified that an officer whose name she did not recall came to interview her after she spoke to Hickey. McGlasson testified that he had no recollection of being called by Hickey or of interviewing Fortin.

[7]Three lists of discovery documents that the Commonwealth sent to the trial attorney containing references to these police reports were presented as evidence that the reports were sent to defense counsel. Trial counsel testified that he relied on his secretary to cross-check the list of documents with the actual receipt of documents and that she may not have brought them to his attention. The motion judge concluded based on unrebutted testimony that the Commonwealth did provide these documents.

[8]Hickey testified at the motion hearing that he left the Lowell police department in November, 1982, and believed that the department had followed up on his report and dismissed Barger as a suspect. Hickey claimed that he contacted the defendant's trial counsel after reading an article about the appeal that stated that there was no exculpatory evidence introduced at trial.

[9]In her affidavit (as well as in her later testimony), Fortin contradicted some of the information contained in the police report, but did admit that she may have implied to both the police and her neighbor that Barger was involved in the murder.

"Fortin . . . testified in 2004 before me that she described to the officers the nature of her relationship with Mark Barger. Her present testimony is that they did not have a happy marriage. They had heated arguments, but during the period in which they dated and were married he never hit her. Fortin stated that twice he pushed her. One of those pushes, occurring around February 4, 1980, she described as a 'one hand wrist-type push.' As a result of the push, Fortin hit her head on the wall and required hospitalization for a concussion.

"Fortin testified that in 1980 Barger was twenty-six years old and 6'5". She represented in her affidavit and during sworn testimony that on February 8, 1980, Barger was working the 3 P.M. to 11 P.M. shift, which was his usual shift at Pandel in Lowell. At Pandel, Barger worked with dyes and often returned home with dye on his clothing. Sometimes he went out after work and drank with friends. Barger kept a full-size axe handle under the front seat of his car; however, Fortin never saw the axe handle after the murder. On the night of the murder, Barger's car was being repaired. As a result, Fortin relayed, in order to get to work he walked or was picked up by friends. If he walked, the best way . . . would have been to walk in a direction that would have led past [the victim's apartment]. Fortin stated that [the victim's apartment] was only a block away from the house she lived in with Barger and described South Walker as 'not a large street.'

"Fortin testified that she was not afraid of Barger in February 1980 or April 1981, but she did not like him. During the last week of January 1980, Barger stated to Fortin: 'If I don't kill myself, I'm going to kill someone.'

"Fortin confirmed that Barger had engaged in certain activities that she noted in the early morning hours of February 9, 1980; these were the hours after [the victim] was murdered. That night, she did not see Barger return home but she was awoken about 3 or 4 A.M. by the washing machine, which was running loudly because it was unbalanced. Her husband had washed the clothing that he wore to work earlier that evening. She found him asleep on the couch in his underwear. Barger rarely washed his

own laundry and based on Fortin's observations it was even more unusual for him to do wash at 3 or 4 A.M. Of the times when he had done his own laundry, she never knew him to do it so late at night. It is true, however, that he could have done it in the past, without her noticing, by balancing the load.

"Fortin testified that during the daytime hours of February 9, 1980, she made a statement to Barger to the effect that it was terrible that [the victim] was murdered. Barger responded that she probably deserved it. Seven to ten days after the death of [the victim], Barger left Fortin. She saw him only once more, in the summer of 1980. She never saw the axe handle after the death of the victim.

"Carol Fortin was not called to testify at trial, and neither the reports nor their substance was offered at trial by the defendant. On the question of Fortin's present characterization of what she told the Lowell police in 1981, I note that it was clear during her testimony before me that she has no desire to be involved in this matter and was not anxious to cooperate with defense counsel. To be frank, I credit Hickey's recorded recollection of what Fortin said in 1981 more than I do Fortin's present testimony."

2. *Ineffective assistance of counsel claim.* When evaluating an ineffective assistance of counsel claim, we consider whether there has been a "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). The burden lies with the defendant, see *Commonwealth* v. *Healy*, 438 Mass. 672, 677 (2003), and with respect to the second prong of the *Saferian* test, the defendant must show that "better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). Because the defendant already obtained review under G. L. c. 278, § 33E, on his direct appeal from his conviction, "[a]ny claim of ineffectiveness of counsel

presented in a subsequent appeal from the denial of a motion for a new trial, authorized by a single justice of this court, would not be tested under the § 33E standard but on the applicable constitutional standards, State and Federal." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 n.1 (1992).[10]

Here, there is no question that there was serious inattention by the defendant's trial counsel, who testified that he never saw the police reports.[11] Trial counsel left the checking of discovery documents to his secretary, and any misplacement of the reports is attributable to counsel. This negligence "fell measurably below" conduct of an "ordinary, fallible lawyer." *Commonwealth* v. *Saferian, supra.* The motion judge concluded, and we agree, that this inattention deprived the defendant of two grounds of defense: third-party culprit and failure of police to conduct an adequate investigation.

a. *Third-party culprit evidence.* A defendant is entitled to present evidence that another person committed the crime. *Commonwealth* v. *Rosa*, 422 Mass. 18, 22 (1996). The evidence must be relevant, not too remote or speculative, and must not confuse the jury by diverting their attention to collateral matters. *Id.* "If such evidence 'is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.' " *Id.* at 23, quoting *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979).

We must begin by considering how trial counsel would have used the information contained in the police reports to call wit-

---

[10]This is not a case where the claim of ineffective assistance of counsel is based solely on trial counsel's failure to object at trial. In such a case, we have said that the standard for measuring ineffective assistance of counsel is not significantly different from the substantial risk of a miscarriage of justice standard. *Commonwealth* v. *Azar*, 435 Mass. 675, 686 (2002). Here the appropriate standard for assessing the ineffective assistance of counsel claim is the traditional *Saferian* standard. *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

[11]Because the motion judge found trial counsel's testimony credible, we conclude that, in the circumstances of this case, discussed *infra*, failing to raise this issue earlier could not have been a tactical decision on the part of trial counsel, who also was appellate counsel at the time of the direct appeal. See *Commonwealth* v. *Azar, supra* at 686 ("where the same attorney represents a defendant at both the trial and on appeal, a claim of ineffective assistance of counsel is not waived when it is raised for the first time in a postappeal new trial motion").

nesses or further investigate. We assume, as did the motion judge, that trial counsel would have attempted to call Fortin as a witness.[12] We also conclude that the trial judge would have allowed Fortin to testify because, as discussed *supra*, he allowed evidence of two other potential third-party culprits whose ties to the victim were no more remote than Barger's. Thus Fortin's testimony would be no more confusing to the jury.[13] *Commonwealth* v. *Rosa, supra* at 22. As the motion judge observed, although it is not known what Fortin would have testified to in 1990, even her testimony in 2004 contains numerous personal observations that would have been admissible at trial.

As discussed, Fortin testified that on the night the victim was killed, Barger was an increasingly volatile man who, because his vehicle was broken, was traveling on foot to and from work along a route that logically would have taken him past the victim's apartment.[14] On the day before the murder, Barger did not keep his appointment with a psychiatrist he had agreed to see. The psychiatrist had telephoned Fortin at some point after one of Barger's appointments and told her it would be in her best interest to separate from Barger.[15] Barger returned home late the night of the murder and was washing his clothes at 3 or 4 A.M. Barger only washed his clothes once or twice a year and Fortin was not aware of any other time that he washed his clothes after work, although it was possible that he did. In addition, Fortin testified that because he left work at 11 P.M., Barger kept an axe handle, with a rounded end, in his car for protection. She stated that she did not know what, if anything, Barger was carrying when he walked to work that night, and she never saw

[12]This is not unreasonable given that when Hickey told him about the police reports, trial counsel immediately sent his investigator to talk to Fortin. In addition, at trial, counsel brought up evidence of other potential third-party culprits.

[13]The evidence concerning the victim's argument with an unidentified man the day of the murder was extremely remote given that the witness who saw them stated that the man was part of the group that included the victim's roommates, who were leaving to go skiing.

[14]Fortin testified that she did not know which route Barger actually took to work.

[15]Contradicting the information in the police reports, Fortin testified that the psychiatrist did not tell her that Barger was dangerous. Fortin testified that the psychiatrist gave no reason for advising her to separate from Barger.

Barger either take the axe handle out of the car or leave the house with it. Barger also moved out of the house within ten days of the murder. Fortin never saw the axe handle again, although she did not look for it, and she saw Barger once after he left. These details are pertinent to the facts relevant to the issue before us, namely, that the victim had a wound caused by a blunt instrument with a rounded end, that she could have been attacked after 11 P.M., and that the perpetrator likely had blood on his clothes.

Statements allegedly made by Barger, contained in the police reports, also are pertinent. Fortin testified concerning two of them: (1) during the last week of January, 1980, Barger stated, "If I don't kill myself, I am going to kill someone"; and (2) the morning after the murder, when Fortin told Barger about the murder, he stated that the victim probably deserved it.[16] The motion judge correctly concluded that these two statements would have been admissible through Fortin for a nonhearsay purpose, to show Barger's state of mind at the time of the murder.

We need not reach the question whether Fortin's statements to Hickey, contained in the police reports, could have been admitted in evidence. See *Commonwealth* v. *O'Brien*, 432 Mass. 578, 588 (2000). Fortin's testimony alone, as summarized above, is enough to support the motion judge's conclusion that this third-party culprit evidence was a substantial ground of defense.

b. *Evidence of inadequate police investigation.* Defendants have the right to base their defense on the failure of police adequately to investigate a murder in order to raise the issue of reasonable doubt as to the defendant's guilt in the minds of the

[16]The motion judge noted that the Commonwealth did not object to Fortin's testimony; the Commonwealth offered her affidavit and called her as a witness, and thus, the testimony was admitted for its full probative value. *Commonwealth* v. *Stokes*, 374 Mass. 583, 595 n.8 (1978). See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 13.2.1 at 766-767 (7th ed. 1999). The Commonwealth argues that in a future trial, Fortin may decide to invoke her marital privilege and refuse to testify concerning Barger's statements to her. However, if she invoked any privileges, her testimony at the evidentiary hearing would be admissible at trial as the testimony of an unavailable witness. See *Commonwealth* v. *DiPietro*, 373 Mass. 369, 375, 383 (1977). See also P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.4.2 at 479-480, § 8.7.1 at 489-490 (7th ed. 1999 & 2006 Supp.).

jury. *Commonwealth* v. *Bowden*, 379 Mass. 472, 486 (1980).
See *Commonwealth* v. *Reynolds*, 429 Mass. 388, 391 (1999);
*Commonwealth* v. *Person*, 400 Mass. 136, 140 (1987). Here,
Hickey's reports would have been admissible to show that the
police were on notice of Barger as a potential suspect, but that
he was not investigated. *Commonwealth* v. *Reynolds*, *supra* at
391-392 (informants' tips not offered for truth of matter but to
show lack of police investigation). See *Kelly* v. *O'Neil*, 1 Mass.
App. Ct. 313, 316 (1973) (statements to police officer contained
in police report not inadmissible hearsay if not offered for
"truth of the matters"); P.J. Liacos, M.S. Brodin, & M. Avery,
Massachusetts Evidence § 8.2.2 at 466 (7th ed. 1999) ("extra-
judicial statement is not hearsay when offered to prove that the
person to whom it was addressed had notice or knowledge of
the contents").

The motion judge concluded that the defendant was denied
the right to argue that Barger was a legitimate suspect who was
not investigated by police. She also concluded that even if only
Fortin's observations of Barger's behavior at the time of the
murder were admitted, they would have bolstered defense
counsel's ability to argue an inadequate police investigation and
"complemented the argument that police forced Phinney to
confess or that he never confessed at all." There was no abuse
of discretion.

c. *Other issues.* The defendant confessed to the murder, and
this court affirmed the denial of the defendant's motion to sup-
press his statements to police. *Commonwealth* v. *Phinney*, 416
Mass. 364, 370-373 (1993). The Commonwealth argues that
because evidence of the defendant's guilt, particularly in light
of the confession, was strong, the motion for a new trial should
have been denied, i.e., that the evidence of Barger's possible
involvement would not have overcome the defendant's detailed
confession. In addition, the Commonwealth argues that the
judge erred in considering the fact that the defendant's confes-
sion was not tape recorded because, at the time of the
defendant's trial, this court had yet to articulate its concern
about the lack of recording of confessions. See *Commonwealth*
v. *Diaz*, 422 Mass. 269, 273 (1996) (defense counsel entitled to
pursue issue of failure to record statements). See also *Com-*

*monwealth* v. *DiGiambattista*, 442 Mass. 423, 448-449 (2004) (prospectively requiring jury instruction concerning lack of recorded confession, if defendant's unrecorded confession or statement that is product of "custodial interrogation" or "interrogation conducted in a place of detention" is admitted in evidence, and defendant requests instruction).

Concerning the strength of its case, the Commonwealth points to information in the confession that only the killer would know, citing *Commonwealth* v. *Russell*, 439 Mass. 340 (2003), and *Commonwealth* v. *Montanez*, 410 Mass. 290 (1991), to argue that the court must balance the defendant's claim against the weight of the evidence. The Commonwealth's arguments are unavailing. The existence of a confession does not automatically mean that the evidence against the defendant was overwhelming. See generally *Commonwealth* v. *Hardy*, 431 Mass. 387, 397 (2000) (but for judge's thorough instructions, prosecutor's improper closing would have entitled defendant to new trial where evidence was "very strong" but "not overwhelming"); *Commonwealth* v. *Cruz*, 53 Mass. App. Ct. 393, 405 (2001) (error entitled defendant to new trial where evidence was not overwhelming).

At trial, the defendant challenged the voluntariness of his confession, and the strength of the confession was dependent on the jury's believing that details of the crime scene and the condition of the victim's body were not suggested to him during the nearly eight hour interrogation that preceded his confession. Obviously, even at a new trial, the jury are entitled to believe the testimony of the interrogating detective to that effect. But the point is that the defendant was denied the opportunity to present the evidence from the police reports to the jury so they could weigh it against the testimony concerning the defendant's confession. See *Commonwealth* v. *Miller*, 435 Mass. 274, 278 (2001) (evidence that someone else committed crime goes to weight of Commonwealth's case and is contention that jury are entitled to evaluate).

Moreover, the cases the Commonwealth cites do not advance its argument. In *Commonwealth* v. *Russell*, *supra* at 344-345, and cases cited, the defendant's claim of ineffective assistance of counsel (concerning failure to object to jury instructions) was

not raised in his direct appeal and therefore was waived, subjecting it to review solely for a substantial risk of a miscarriage of justice on appeal. Here, the defendant did not waive his claim, as his trial and appellate counsel were the same. See note 11, *supra.* Also, his claim is not the same type of ineffective assistance of counsel. See note 10, *supra.* In *Commonwealth* v. *Montanez, supra* at 293-295, 297, although the defendant's claim of ineffective assistance of counsel was waived on procedural grounds, the court considered it substantively and rejected the claim because the record did not support the claim that the defendant was deprived of an otherwise available and substantive ground of defense. Here the record does support the claim that counsel was ineffective because he did not see the police reports, and the defendant was deprived of *two* available and substantial grounds of defense.

The judge's discussion of the fact that the defendant's confession was not recorded was to point out that the concerns that led to the creation of the rule in the *DiGiambattista* case existed during the defendant's trial. Trial counsel assailed the lack of a recorded confession through cross-examination and in closing argument. We do not know what happened during the long interrogation of the defendant, and the information contained in the police report may have bolstered his contention that the confession was not voluntary. The motion judge did not abuse her discretion in concluding that, although the confession is significant evidence of the defendant's guilt, the defendant was deprived of two available and substantial grounds of defense, denying him a fair trial.

*Conclusion.* For the reasons set forth above, we affirm the motion judge's decision to grant the defendant's motion for a new trial.[17]

*So ordered.*

---

[17]Pursuant to Mass. R. Crim. P. 30 (c) (9), as appearing in 435 Mass. 1501 (2001), the defendant filed a motion for attorney's fees in connection with this appeal. We defer action on his application until defense counsel submits the appropriate material in support of his motion and we review any material the Commonwealth may choose to submit in connection with the motion.