NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12498

COMMONWEALTH  vs.  FERNANDO PEREZ.


Hampden.     May 10, 2018. - September 14, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Constitutional Law, Sentence.  Due Process of Law,
    Sentence.  Practice, Criminal, Sentence.



Indictments found and returned in the Superior Court
Department on February 16 and March 2, 2001.

Following review by this court, 477 Mass. 677 (2017), a
motion for resentencing was heard by Daniel A. Ford, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Elizabeth Caddick for the defendant.
Elizabeth Dunphy Farris, Assistant District Attorney
(Katherine E. McMahon, Assistant District Attorney, also
present) for the Commonwealth.
Elizabeth A. Billowitz & Michelle Menken, for youth
advocacy division of the Committee for Public Counsel Services,
amicus curiae, submitted a brief.


KAFKER, J.  In Commonwealth v. Perez, 477 Mass. 677, 688

(2017) (Perez I), we determined that the juvenile defendant,

Fernando Perez, received a sentence for his nonhomicide offenses that was presumptively disproportionate under art. 26 of the Massachusetts Declaration of Rights in that the time he would serve prior to parole eligibility exceeded that applicable to a juvenile convicted of murder.  We therefore remanded the matter to the Superior Court for a hearing to determine whether, in light of the factors articulated by the United States Supreme Court in Miller v. Alabama, 567 U.S. 460, 477-478 (2012), the case presented extraordinary circumstances justifying a longer parole eligibility period.  Perez I, supra.  On remand, a judge in the Superior Court (hearing judge) held a Miller hearing and concluded that extraordinary circumstances were present.  He therefore denied the defendant's motion for resentencing, leaving intact a longer period of incarceration for the defendant prior to his being eligible for parole than would be the case for a juvenile convicted of murder.  The defendant was eligible for parole after twenty-seven and one-half years in prison, while a juvenile convicted of murder at that time would have been eligible for parole after fifteen years. See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 673 (2013), S.C., 471 Mass. 12 (2015).  The defendant appealed, and we granted his application for direct appellate review.  Here, we clarify the extraordinary circumstances requirement justifying longer periods of incarceration prior to

eligibility for parole for juveniles who did not commit murder than for those who did. We conclude that the hearing judge erred in finding extraordinary circumstances in this case, particularly in regard to the juvenile's personal and family attributes. The crimes he committed meet the extraordinary circumstances requirement, but his personal and family circumstances do not.[1]

Facts. As we described in Perez I, 477 Mass. at 679-680, in the early hours of December 23, 2000, the defendant, "then aged seventeen, committed two robberies and attempted a third. The three crimes occurred within thirty minutes of each other and within a several-block radius of downtown Springfield." That night his uncle, Tito Abrante, gave the defendant a gun and encouraged him to get out of the vehicle and commit these crimes. The uncle "shuttled [the defendant] from crime to crime. The defendant first robbed a married couple at a train station and then robbed a man walking on Main Street. In the third incident, he approached Carlo D'Amato, an off-duty detective with the Springfield police department" and threatened to rob him (footnote omitted). Id. D'Amato identified himself as a police officer and told the defendant to desist. "As Detective D'Amato reached for his badge, the defendant shot him;

---

[1] We acknowledge the amicus brief submitted by the youth advocacy division of the Committee for Public Counsel Services.

the defendant continued to fire the weapon as he retreated from the scene. Detective D'Amato suffered serious injuries that required multiple surgeries." Id. at 680. The first bullet missed, but the second bullet went through his colon, nicked his aorta, passed through his vena cava, and nicked his right kidney. Indeed, after the Miller hearing, the hearing judge found that D'Amato is permanently disabled and has undergone further surgeries since the defendant's initial sentencing, and that "in the aftermath of this incident his life became a living hell and has been changed forever." For this crime spree, the defendant was convicted by a jury of armed robbery, armed assault with intent to rob, assault and battery by means of a dangerous weapon, and firearms offenses. After an evaluation under G. L. c. 123, § 15 (e), and after considering further information about the defendant's upbringing, the trial judge sentenced him to an aggregate sentence of thirty-two and one-half years, with parole eligibility after twenty-seven and one-half years.[2]

---

[2] On one set of indictments, the trial judge sentenced the defendant as follows: armed robbery (count 1), from five to seven and one-half years in State prison; armed robbery (count 3), from five years to five years and one day in State prison, to run from and after the sentence for count 1; armed robbery (count 5), ten years' probation to run from and after the sentence on count 4 in the second set of indictments; and unlawful possession of a firearm (count 7), two and one-half

Miller hearing.  At the Miller hearing on remand, the
hearing judge, who had presided over Abrante's trial arising
from the same incidents, made further findings.[3]  He found that
the defendant had a "very difficult upbringing" characterized by
domestic violence.  The hearing judge found that the defendant's
father physically and emotionally abused his mother, threatening
to kill her in front of the defendant and his siblings.  The
defendant "would sometimes arm himself with baseball bats and

years in a house of correction, concurrent with the sentence for
count 3.

On the second set of indictments, the trial judge sentenced
the defendant as follows:  armed assault with the intent to rob
(count 2), from seven and one-half to ten years in State prison,
to run from and after the sentence on count 3 in the first set
of indictments; assault and battery by means of a dangerous
weapon (count 4), from nine years and 364 days to ten years in
State prison, to run from and after the sentence for count 2;
unlawful possession of a firearm (count 5), two and one-half
years in a house of correction, concurrent with the sentence for
count 7 of the first set of indictments; and unlawful discharge
of a firearm (count 6), one day in a house of correction,
concurrent with the sentence for count 5.

[3] The hearing judge took no testimony at the Miller hearing,
see Miller v. Alabama, 367 U.S. 460 (2012), but relied on
documentary evidence, including the trial transcript and
presentencing reports.  Despite the fact that the hearing judge
presided over Tito Abrante's trial and thus was presumably more
familiar with the facts of the case than any other judge to whom
the case might have been assigned, he nonetheless did not hear
the evidence as it was presented in the defendant's trial.
Rather, he could consider only the written record.  In these
circumstances, we do not give his decision the same "special
deference" that we give when a posttrial motion is heard by the
same judge who presided at trial (citation omitted).  See, e.g.,
Commonwealth v. Moffat, 478 Mass. 292, 299 (2017).

screwdrivers in order to be prepared to protect his mother."
His mother and the children moved frequently to escape the
violence, and the mother eventually remarried and moved to
Massachusetts.  For a time, the defendant's "Uncle Eddie," his
mother's brother, assisted in rearing the children.  As the
hearing judge found, "By all accounts, Uncle Eddie was a
positive influence who became a father figure to the defendant
and taught the defendant to be 'a good man.'  The defendant
loved Uncle Eddie very much and aspired to be like him."
Unfortunately, Uncle Eddie was murdered in Puerto Rico, leaving
the defendant "depressed, preoccupied, and even obsessed with
his uncle's death."  Shortly thereafter, Abrante was released
from prison after serving a seventeen-year sentence on prior
offenses and moved in with the family.

The hearing judge found that Abrante "was a monster in the
most damning sense of that word."  "He told the defendant
stories about violent acts that he had committed and said that
he wanted to train the defendant to be his 'back-up' so that
they could avenge the death of Uncle Eddie.  He bragged about
killing a number of people, including a fifteen year old girl
and other women and children.  He plied the defendant with drugs
and alcohol, and encouraged him to have sexual relations with
'older women.'  He beat a woman and attacked her with a knife in
the defendant's presence.  He put the defendant 'on alert' to

accompany him to New York to perform a 'hit.' He tried to control the defendant's movements and allowed him to visit with his mother and girl friend for only short periods of time. The defendant claimed that he was in constant fear of [Abrante], and worried that he would be killed if he crossed his uncle."

The defendant did briefly move to Maine to enter the Job Corps, but returned to Massachusetts after a few months. The hearing judge was unable to determine whether the defendant returned because, as the Commonwealth argued, he liked the criminal lifestyle to which Abrante had exposed him or because, as the defendant argued, he was lonely and missed his girl friend and his mother. The hearing judge found only that the defendant returned "despite his fear of his uncle and with the knowledge that his uncle was attempting to recruit him into a life of crime."

The hearing judge also made findings about the defendant's personal characteristics. He found that the defendant's intelligence quotient was "at the low end of the normal range," that he had been in special education, and that he "struggled to keep up with his school work." He was diagnosed with posttraumatic stress disorder, depression, and attention deficit disorder. As the hearing judge found, "[o]ne of [his mental health counsellors] described [him] as trying 'to please others all the time,' and noted that he was not 'very strong' and 'not

a leader.'"  An evaluator observed:  "He has some difficulty comprehending what is said to him, and has little skill at understanding complex situations and at predicting outcomes. When he is not sure what to say he acquiesces, when he is not sure what to do, he complies, and when he does not know a problem's solution, he is more likely to guess than inquire for help."  His mental conditions, however, did not interfere with his ability to form the intent required for his offenses, and he knew right from wrong.  The hearing judge also noted that, despite his fear of Abrante, the defendant was able to stand up to him on at least one occasion, refusing to accompany him to New York.  The defendant was not under duress when he committed his crimes, as the jury found.

Based on his findings, the hearing judge considered the Miller factors.  As we articulated in Perez I, those factors are: "(1) the particular attributes of the juvenile, including 'immaturity, impetuosity, and failure to appreciate risks and consequences'; (2) 'the family and home environment that surrounds [the juvenile] from which he cannot usually extricate himself'; and (3) 'the circumstances of the . . . offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected him.'"  Perez I, 477 Mass. at 686, quoting Miller, 567 U.S. at 477.  Weighing those factors, the hearing judge

determined that although the defendant's "horrible" family and home environment, and the influence of Abrante, might have favored an earlier parole eligibility, the circumstances of the crimes themselves, particularly the catastrophic injuries suffered by D'Amato, outweighed those considerations.[4]  As to the defendant's personal characteristics, the hearing judge determined that although the defendant might have acted impetuously, he nonetheless had the maturity to appreciate the risks and consequences of his actions.  The hearing judge therefore ruled that the Commonwealth had demonstrated the existence of extraordinary circumstances warranting the imposition of a sentence treating the defendant more harshly for parole purposes than a juvenile convicted of murder.

Discussion.  1.  Standard of review.  We review the denial of a motion brought under Mass. R. Crim. P. 30 (a), as appearing in 435 Mass. 1501 (2001), for abuse of discretion or error of

---

[4] The hearing judge also found that "there was evidence that the defendant later laughed about how . . . D'Amato lay in the street, holding his stomach and struggling for his life."  In fact, a witness testified that the defendant laughed at some points while describing his offenses to her, but she could not recall precisely at which points.  In our view, the trial transcript is unclear regarding whether the defendant specifically laughed about D'Amato's suffering.  As there was no testimony presented at the Miller hearing, "we are in 'as good a position as the [hearing] judge to assess the trial record." Commonwealth v. Sullivan, 478 Mass. 369, 380 (2017), quoting Commonwealth v. Phinney, 446 Mass. 155, 158 (2006), S.C., 448 Mass. 621 (2007).

law.[5]  See, e.g., Commonwealth v. Wright, 469 Mass. 447, 461

(2014).  The defendant argues that the hearing judge erred by

finding extraordinary circumstances and therefore failing to

resentence him so as to provide for a parole eligibility date

conforming to that available to juveniles convicted of murder.

He contends that the hearing judge's erroneous determination and

conclusion violates art. 26's guarantee of proportionality, as

we defined proportionality in Perez I.  Where a defendant claims

that a judge has made an error of constitutional dimension, "we

accept the judge's subsidiary findings of fact absent clear

error and leave to the judge the responsibility of determining

the weight and credibility to be given . . . testimony presented

at the motion hearing" but "review independently the application

of constitutional principles to the facts found."  Commonwealth

v. Villagran, 477 Mass. 711, 713 (2017), quoting Commonwealth

---

[5] In Commonwealth v. Perez, 477 Mass. 677, 681-682 (2017), we stated:

> "We review the denial of a motion brought under Mass. R. Crim. P. 30 (a)[, as appearing in 435 Mass. 1501 (2001)], for an abuse of discretion. Commonwealth v. Wright, 469 Mass. 447, 461 (2014).  Under that standard, the issue is whether the judge's decision resulted from '"a clear error of judgment in weighing" the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives' (citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014)."

To be clear, the denial of such a motion is also reviewed for error of law.  See, e.g., Wright, supra.  In the instant case, we conclude that there was an error of law.

v. Meneus, 476 Mass. 231, 234 (2017), and Commonwealth v. Amado, 474 Mass. 147, 151 (2016) (reviewing ruling on motion to suppress).

In the instant case, however, the hearing judge was not the trial judge, and his fact finding was based on a review of the trial record. We are therefore in the same position as the hearing judge in this regard. That being said, with the exception of his finding concerning the defendant's laughter regarding the injuries inflicted on the officer, see note 4, supra, we accept and adopt his subsidiary findings. We do, however, reach a different conclusion regarding the application of art. 26 to those facts.

2. Sentencing after Diatchenko. After our decision in Diatchenko, "a sentencing statute prescribing life without the possibility of parole [for murder in the first degree] in effect became a statute prescribing, for juvenile offenders, life with the possibility of parole after fifteen years." Commonwealth v. Costa, 472 Mass. 139, 140 (2015). We further held that "a life sentence without the possibility of parole [for murder in the first degree] violates art. 26, regardless of whether such sentence is mandatory or imposed in the sentencing judge's discretion." Perez I, 477 Mass. at 683, citing Diatchenko, 466 Mass. at 671. Under the statutes then in effect, a sentencing judge had no discretion to impose a period

of incarceration prior to eligibility for parole that was longer than fifteen years, even for murder in the first degree.  Costa, supra.  See note 6, infra.  In Perez I, supra, we were then presented with the question "whether the requirement of proportionality bars the imposition, on a juvenile defendant, of consecutive sentences for nonmurder offenses with a resulting parole eligibility date that exceeds that applicable to juveniles convicted of murder."

In Perez I, 477 Mass. at 686, we ruled:

"[A] juvenile defendant's aggregate sentence for nonmurder offenses with parole eligibility exceeding that applicable to a juvenile defendant convicted of murder is presumptively disproportionate.  That presumption is conclusive, absent a hearing to consider whether extraordinary circumstances warrant a sentence treating the juvenile defendant more harshly for parole purposes than a juvenile convicted of murder."

At such a hearing, the judge must weigh the factors articulated in Miller, 567 U.S. at 477-478, "appl[y] them uniquely to the individual defendant, and consider[] whether a [parole eligibility date] exceeding that applicable to a juvenile convicted of murder (at least with respect to parole eligibility) is appropriate in the circumstances."  Perez I, 477 Mass. at 686, citing Diatchenko, 466 Mass. at 668.  We clarify today that, for juveniles, the criminal conduct alone is not sufficient to justify a greater parole eligibility period than is available for murder.  The juvenile's personal and family

history must also be considered independently; this consideration of the individual's personal and family history is also not the ordinary mitigation analysis associated with sentencing. We emphasize today that both the crime and the juvenile's circumstances must be extraordinary to justify a longer parole eligibility period. In the instant case, the criminal conduct was comparable to murder but the juvenile's individual characteristics did not establish that there was no reasonable possibility of reform and redemption within the parole eligibility period provided for juvenile murderers.[6]

---

[6] In response to our decisions in Diatchenko and Commonwealth v. Brown, 466 Mass. 676 (2013), the Legislature established specific parole eligibility dates for juvenile offenders convicted of murder in the first degree. G. L. c. 279, § 24.

"The resulting legislation establishes that, 'for murder in the first degree committed by a person on or after the person's fourteenth birthday and before the person's eighteenth birthday, the court shall fix a minimum term' before the individual becomes eligible for parole 'of not less than [twenty] years nor more than [thirty] years.' Id. Where the conviction of murder in the first degree is based on extreme atrocity or cruelty, 'the court shall fix a minimum term of [thirty] years.' Id. Finally, where the conviction of murder in the first degree for a juvenile offender is based on 'deliberately premeditated malice aforethought . . . , the court shall fix a minimum term of not less than [twenty-five] years nor more than [thirty] years.' Id."

Commonwealth v. Costa, 472 Mass. 139, 145 (2015). The defendant was sentenced in 2002, well before the enactment of this new sentencing statute and while the old sentencing statute was still in force. As previously explained, "[b]ecause our

The Miller principles we apply arise from the Supreme Court's recognition "that children are constitutionally different from adults for purposes of sentencing.  Because juveniles have diminished culpability and greater prospects for reform, . . . 'they are less deserving of the most severe punishments.'"  Miller, 567 U.S. at 471, quoting Graham v. Florida, 560 U.S. 48, 68 (2010).  As the Court further explained, "children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking"; they "are more vulnerable . . . to negative influences and outside pressures" and less able "to extricate themselves from horrific, crime-producing settings"; and their character traits "are 'less fixed' and [their] actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'"  Miller, supra, quoting Roper v. Simmons, 543 U.S. 551, 569-570 (2005).  This recognition is based in part on advances in scientific research concerning the development of the juvenile brain, Miller, supra at 471-472, research that we have relied on as well.  Diatchenko, 466 Mass.

---

decisions in Diatchenko and Brown struck the parole ineligibility provision from [the old] statute when applied to juvenile offenders, the result was that . . . [the] statute . . . required a sentence of life with parole eligibility after fifteen years."  Costa, supra at 146.  We therefore compare the defendant's parole eligibility date to the fifteen-year requirement.

at 669-670.  The Miller Court, in ruling that the particular juvenile murderer could not be subject to a mandatory sentence of life without the possibility of parole, opined that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon . . . because of the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'"  Miller, supra at 479-480, quoting Roper, supra at 573, and Graham, supra at 68.

In Miller, 567 U.S. at 465, 478, the Supreme Court expressly recognized the viciousness of the murder, but nonetheless concluded that the individual characteristics of the juvenile murderer must be considered before imposing a life sentence without parole.  See Roper, 543 U.S. at 573 ("An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death").  We likewise consider both the crime and the individual, although we provide a more protective analysis under art. 26 regarding the individual characteristics.  See Perez I, 477 Mass. at 683 ("The point of

our departure from the Eighth Amendment jurisprudence was our determination that, under art. 26, the 'unique characteristics of juvenile offenders' should weigh more heavily in the proportionality calculus than the United States Supreme Court required under the Eighth Amendment [to the United States Constitution]").  The criminal conduct must be extraordinary and thus comparable to murder, and the personal characteristics of the juvenile must also be extraordinary in that they necessitate a parole eligibility period longer than that available for a juvenile murderer, because there is no reasonable possibility of redemption in less than that period of time.

In regard to the individualized inquiry, we have further explained:

> "Given current scientific research on adolescent brain development, and the myriad significant ways that this development impacts a juvenile's personality and behavior, a conclusive showing of traits such as an 'irretrievably depraved character,' Roper, 543 U.S. at 570, can never be made, with integrity, by the Commonwealth at an individualized hearing to determine whether a sentence of life without parole should be imposed on a juvenile homicide offender.  See Miller, [567 U.S. at 471].  Simply put, because the brain of a juvenile is not fully developed, either structurally or functionally, by the age of eighteen, a judge cannot find with confidence that a particular offender, at that point in time, is irretrievably depraved."

Diatchenko, 466 Mass. at 669-670.

We therefore do not require the Commonwealth to prove that the defendant exhibited "irretrievable depravity" or

"irreparable corruption" such as might justify, for Eighth Amendment purposes albeit not under art. 26, a sentence of life without parole.  See Miller, 567 U.S. at 471, 479-480.  See also Diatchenko, 466 Mass. at 669-670.[7]  Rather, we require the Commonwealth to prove that the juvenile's personal characteristics make it necessary to delay parole eligibility for a time exceeding that available to juveniles convicted of murder.  Stated another way, the Commonwealth must prove that there is no reasonable possibility of the juvenile's being rehabilitated within the time after which a juvenile convicted of murder becomes eligible for parole.[8]  As applied to the

---

[7] We also note that the United States Supreme Court, in focusing on "irreparable corruption" and "irretrievable depravity," was considering life without parole, not shorter parole eligibility periods, as we are here.  See generally Miller, 567 U.S. 460; Graham v. Florida, 560 U.S. 48 (2010); Roper v. Simmons, 543 U.S. 551 (2005).

[8] Without raising the issue with either the trial or the hearing judge, the defendant urges us to hold that the Commonwealth must make this showing at least by clear and convincing evidence.  As he points out, some State courts have weighed the due process considerations set forth in Mathews v. Eldridge, 424 U.S. 319 (1976), and decided in favor of imposing a high standard on the government in cases where a juvenile was facing a sentence of life without parole.  See Commonwealth v. Batts, 640 Pa 410, 475-476 (2017); Davis v. State, 2018 WY 40, ¶¶ 48-50.  Because the evidence here was insufficient to satisfy the extraordinary circumstances requirement even under a preponderance standard, we need not resolve the issue, and do not, given its complexity and its first being raised on appeal. As a precautionary matter, however, if a sentencing judge considers that the difference between a preponderance and a clear and convincing evidence standard would matter in the

defendant, that length of time is fifteen years.  See note 6, supra.

We recognize the difficulty and complexity of this task, and the need to develop better scientific tools to identify the factors, such as psychopathy, that support a finding that a juvenile is not reasonably likely to be rehabilitated.  See T. Grisso & A. Kavanaugh, Prospects for Developmental Evidence in Juvenile Sentencing Based on Miller v. Alabama, 22 Psychol. Pub. Pol'y & L. 235, 240 (2016).  See also Roper, 543 U.S. at 573, citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 701-706 (4th ed. rev. 2000) ("As we understand it, this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under [eighteen] as having antisocial personality disorder, a disorder also referred to as psychopathy or sociopathy . . .").  It is for this reason, however, that we consider parole eligibility periods longer than those provided for juvenile murderers to require extraordinary circumstances.

Applying these principles to the defendant's case, it is clear that the crimes themselves met the extraordinary circumstances requirement of Perez I.  The defendant committed

determination of exceptional individual circumstances justifying a longer parole eligibility period, he or she should so indicate.

two armed robberies and attempted a third. In that attempt, the defendant repeatedly shot a police detective, gravely and permanently injuring him after he identified himself and told the defendant to desist. The detective has suffered terribly from the shooting. That the defendant did not kill D'Amato strikes us as a matter of pure happenstance. The defendant was also the principal in all of these crimes, not merely a joint venturer with no control over the principal's actions. Moreover, while it seems clear that the defendant was under Abrante's influence, he nonetheless acted under his own volition. Nothing forced the defendant to shoot D'Amato; he chose to do that.

However, we are not persuaded that the defendant's personal characteristics meet the extraordinary circumstances requirement set out in Perez I. As far as we are able to tell, until he embarked on his crime spree, the defendant never engaged in any criminal activity apart from a charge of larceny that was dismissed after he completed a pretrial diversion program. As a child, the defendant lived in a horrific, violent environment from which he could not extricate himself. He enjoyed a brief respite from his father's abuse of his mother when he was in the care of Uncle Eddie, but with Uncle Eddie's death, he lost that positive adult role model and became susceptible to Abrante's pernicious influence. By that time, the defendant was a

teenager and had some ability to extricate himself from that environment, but could not leave his family permanently.[9]  The defendant is also someone of low intelligence with a diagnosis of posttraumatic stress disorder, depression, and attention deficit disorder.

We see no basis to conclude, on this record, that the defendant has the extraordinary individual characteristics that necessitate a longer parole eligibility period than that available for a juvenile murderer.  Rather, as the Supreme Court emphasized in Miller, 567 U.S. at 478-479, the juvenile had mental health problems but no criminal history, and "if ever a pathological background might have contributed to [the] commission of a crime, it is here."  Based on the evidence adduced at trial and considered at the Miller hearing, we conclude that this case does not present extraordinary circumstances justifying incarcerating the defendant, prior to parole eligibility, longer than a juvenile convicted of murder.

Furthermore, we see no reason to remand this matter for a second Miller hearing at this point.  The record before us is sufficient.  The crime spree was vicious and comparable to

---

[9] As noted above, the hearing judge was unable to resolve a dispute between the parties as to the defendant's reason for returning to Massachusetts from Maine.  Absent any evidence clearly indicating, as the Commonwealth contended, that the defendant was motivated to follow Abrante into a life of crime, we give the defendant the benefit of the doubt on this point.

murder.  But the Commonwealth will not be able to demonstrate that there is no reasonable possibility of rehabilitation within the probationary period provided to juvenile murderers given the defendant's lack of criminal history, his low intelligence and mental health problems, and his terrible upbringing.  The defendant's sentence is therefore amended to conform his parole eligibility to that available to juveniles convicted of murder.[10]

Nothing we say today requires that the defendant receive a shorter aggregate <u>sentence</u> for his crimes.  Those crimes, as detailed above, were serious and warrant serious punishment. Our Constitution requires, however, that a juvenile who commits only nonhomicide offenses be presumptively eligible for <u>parole</u> no later than a juvenile convicted of murder, unless the Commonwealth proves that both the crimes themselves and the characteristics of the juvenile present extraordinary circumstances justifying harsher treatment.  This the Commonwealth has not done.  Moreover, as in <u>Diatchenko</u>, our decision does not mandate that the defendant be paroled once he has served the portion of his sentence prior to his being

---

[10] Had we ordered a new sentencing hearing, both the defendant and the Commonwealth would have been permitted to present evidence concerning the defendant's conduct since his original sentencing.  See <u>Costa</u>, 472 Mass. at 148-149 (in resentencing following invalidation of original sentence, judge may consider defendant's disciplinary record and other conduct since sentencing, "whether favorable or unfavorable, and whether offered by the defendant or by the Commonwealth").

eligible for parole. "At the appropriate time, it is the purview of the Massachusetts parole board to evaluate the circumstances surrounding the commission of the crime, including the age of the offender, together with all relevant information pertaining to the offender's character and actions during the intervening years since conviction." Diatchenko, 466 Mass. at 674. The defendant, who was sentenced in 2002, has already served more than fifteen years of his sentence. Those years have presumably provided the defendant with the opportunity to demonstrate his own capacity for redemption and rehabilitation. After making its evaluation, the parole board retains the power to allow or deny parole in the exercise of its own judgment.

Conclusion. The order denying the defendant's motion for resentencing is vacated, and the matter is remanded to the Superior Court for resentencing in accordance with this opinion.

So ordered.