Commonwealth vs. Thomas Rosa, Jr.

Suffolk. October 4, 1995. - February 9, 1996.

Present: Liacos, C.J., Wilkins, Lynch, Greaney, & Fried, JJ.

*Identification. Evidence,* Relevancy and materiality, Identification, Presumptions and burden of proof. *Practice, Criminal,* Instructions to jury, Reasonable doubt, Capital case. *Homicide.*

At the trial of a murder indictment, the judge did not abuse his discretion in excluding an identification of another person as the defendant by a person uninvolved in the case, where the evidence was not demonstrated to be relevant: the alleged alternate perpetrator neither had a strikingly similar appearance to the defendant nor had committed crimes of a substantially similar nature. [22-25]

At a murder trial, considering the judge's main charge and supplemental instructions as a whole, there was no error in the judge's discussion of circumstantial evidence that could have misled the jury as to their responsibility to find proof beyond a reasonable doubt in order to convict. [25-29]

At a murder trial, there was no substantial likelihood of a miscarriage of justice in the judge's instruction defining extreme atrocity or cruelty. [29-32]

Indictments found and returned in the Superior Court Department on February 11, 1986.

The cases were tried before *Robert W. Banks,* J.

*Brownlow M. Speer,* Committee for Public Counsel Services, for the defendant.

*Edmond J. Zabin,* Assistant District Attorney (*Katherine E. McMahon,* Assistant District Attorney, with him) for the Commonwealth.

Liacos, C.J. On March 4, 1993, a Suffolk County jury convicted the defendant, Thomas Rosa, Jr., of murder in the first degree and kidnapping. The judge sentenced Rosa to life imprisonment, with a concurrent sentence on the kidnapping conviction of from nine to ten years. Rosa asserts several claims of instructional error, and argues that the judge interfered with his ability to put on a defense by excluding

certain evidence. Finding no error, we affirm the convictions.[1] Having reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E (1994 ed.), we discern no other errors and no reason to reduce the conviction to a lesser degree of murder.

The evidence at trial supported findings as to the following facts.[2] Sometime around midnight on the night of December 6, 1985, Gwendolyn Taylor, in the company of one Charles Ferguson, left the home of Ferguson's aunt in the Dorchester section of Boston. Taylor lived a short distance away on Talbot Avenue. The couple proceeded down Talbot Avenue. At a point within 150 feet of Taylor's apartment the two parted ways. Ferguson immediately ran back to his aunt's house, where he then telephoned Taylor's apartment, to see if she had made it home safely.

Ferguson's stepsister, Charita Offley, shared the apartment with Taylor. She answered the telephone, stating that Taylor had not yet arrived home. Ferguson called again five minutes later, and was again told that Taylor had not returned. Ferguson called a third and fourth time, and at that point Charita went onto the porch of the third-floor apartment to look for Taylor on the street. She saw Taylor sitting on the stairs to the apartment building's entrance, with a man standing in front of her. Charita shouted to Taylor to come to the telephone. Taylor responded that she would call Ferguson back. When Charita told Ferguson this, Ferguson demanded to speak to Taylor. Charita called out to Taylor again, and Taylor repeated that she would call Ferguson back.

A few minutes later the doorbell to Taylor and Charita's apartment rang. Charita went to the porch and saw Taylor

---

[1]Direct appeal pursuant to G. L. c. 278, § 33E (1994 ed.), lies in this court only for conviction for murder in the first degree. We consolidate the appeal from the kidnapping conviction in the interest of judicial efficiency. See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 379 n.1 (1989). Aside from a claim of instructional error in the charges on extreme atrocity or cruelty and felony-murder, the defendant's assignments of error apply equally to the two convictions.

[2]The first trial of the defendant on these indictments ended in a mistrial. The second trial resulted in convictions of murder in the first degree, kidnapping, and aggravated rape. These convictions were reversed on grounds not relevant to the issues raised in this appeal. See *Commonwealth* v. *Rosa*, 412 Mass. 147, 148 (1992). We state the evidence relevant to the issues raised on appeal in this case.

had returned to the entrance of the building. Taylor saw Charita on the porch, and asked her to come downstairs. Arriving in the entranceway, Charita saw a man standing beside Taylor, holding what Charita testified was "a shiny object" near Taylor's shoulder. Charita described Taylor as visibly frightened, and Taylor asked Charita if she had $100. Charita went back upstairs to the apartment to see if their other two roommates had any money. The man at Taylor's side shouted after Charita not to call the police, and Taylor told Charita that "he's not kidding."

Charita woke her other two roommates, Kevin Neal and "Tammy" Offley, and reported that Taylor was in trouble. All three went onto the porch and saw that Taylor and the man had moved to the other side of Talbot Avenue, with the man holding Taylor close to him with his arm around her neck. Taylor, in an "hysterical" tone, again asked for $100. Neal stated that he did not have that much money. The man and Taylor then walked about in a nearby park and basketball court, finally proceeding down an alley.

Neal rushed down the stairs while Charita called the police. Shortly thereafter, the Boston police arrived. The three roommates related events to two police officers, and the officers drove down the alley with lights on to search for Taylor. They then waited for one-half hour in silence to listen for any sounds. These searches were in vain.

The next morning an employee of a nearby automobile body shop arrived at work. He noticed that the door of one of the motor vehicles awaiting repair was open, and he could see a limp human arm hanging out the door. Walking up to the vehicle he saw a woman's body, naked, with a cloth wrapped around her neck. He called the police, who subsequently identified the victim as Gwendolyn Taylor.

At trial, two witnesses identified the defendant as the man with Taylor and the person who walked off with Taylor the last time she was seen alive. Charita Offley identified Rosa at trial, stating she saw his face when she, Taylor, and the man were in the entryway of the apartment building.[3] A second witness, Sharon Areh, testified that she had seen Rosa hold-

---

[3]Charita's pretrial description and identification of Rosa was consistent with her trial testimony. Charita described the assailant as an Hispanic male, approximately five feet, nine inches tall, with a slim build, and wearing black pants and a tan coat. Charita went to the office of Boston police

ing Taylor at the entrance to the apartment building. Areh had been walking home with a companion at the time. She stated at trial that she recognized the man holding Taylor as Rosa. Areh had seen him on several occasions previously because Rosa lived upstairs from Areh's cousin.[4]

Physical evidence corroborated the identification of the two witnesses. Police detectives had collected physical evidence at the scene of the crime, including blood samples. The results of blood typing of those samples were consistent with the government's theory that Rosa committed the crime. Several hairs were found on Taylor's clothing, although none could be matched to anything that would implicate Rosa. The other major piece of evidence was a brown coat found at Rosa's apartment. Two identification witnesses, Charita and Tammy Offley, had stated that the man with Taylor had been wearing

Detective Edward Doyle and requested to look at photographs in an attempt to identify the man who she had seen abduct Taylor. After she informed Detective Doyle that the man she saw was an Hispanic male, Detective Doyle gave Charita a book of photographs of Hispanic males to review.

After looking through the first book for about two minutes, Charita came to a picture and told Detective Doyle that the picture "looks like him but this isn't him. His eyes are different." Charita continued to look through the same book and once again came across the same picture. She recognized that the second picture was of the same man as the first picture, but not the man she saw assaulting Gwendolyn Taylor. Once Charita completed that entire book, she looked at the second book with pictures of Hispanic males. When Charita came across the defendant's picture, she told Detective Doyle, "This is him." Detective Doyle then asked Charita if she was sure, to which Charita responded, "I'm definite. If it's not him it's an identical twin." Charita made subsequent in-court identifications of the defendant and the defendant's tan coat at the trial and while testifying in other preliminary court appearances. Charita also testified that there was no doubt in her mind that the defendant was the man she observed holding the victim against her will.

[4]Areh recognized the defendant as a man that she had seen in her cousin's apartment building on several occasions prior to December 7, 1985. The day after the incident, Areh contacted Detective Sergeant Charles M. Horsley of the Boston police department's homicide unit. On December 9, Sergeant Horsley brought Areh to the Area B police station to look at photographs with Detective Doyle. Areh found the same picture of the defendant that Charita had picked out the previous day and identified the defendant as the man she had seen forcing the victim to walk with him on Talbot Avenue on December 7.

a brown coat and that the coat found at Rosa's was the same coat they had seen.[5]

1. *Evidence of a "look-alike."* In July, 1986, some eight months after the murder but before the first trial began, Rosa's attorney visited the Charles Street jail in Boston on unrelated business. Spotting a prisoner he thought was Rosa, the attorney struck up a conversation. Only after the attorney spoke with this person for a while did he realize that the inmate was not Rosa.

Rosa made a pretrial motion to admit evidence regarding the person that his previous attorney had mistaken for Rosa. The proffered evidence consisted of police mugshots of the alleged look-alike and the affidavit of the prior attorney who had made the misidentification. The judge refused to admit the look-alike evidence at trial.

Rosa claims error. He contends that in his effort to show that he did not commit the crimes he had a right to demonstrate that some other person did in fact commit the crime. Rosa also argues that any issue of how similar the look-alike is in appearance is a matter for the jury, not for the judge in deciding admissibility. Finally, Rosa charges that the essence of the case against him is identification evidence, and therefore misidentification evidence is especially crucial to his defense.

Rosa is correct that the demonstration that a third party committed the crimes charged is a time-honored method of defending against a criminal charge. See, e.g., *Commonwealth v. Abbott*, 130 Mass. 472, 475 (1881). Yet that trial tactic is, like any other, limited by the fundamental principle that evidence must be relevant. If the defense offers its own theory of the case (beyond merely putting the government to its proof), its evidence must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative. Evidence that another person committed the crime charged also poses a real threat of prejudice, especially the risk of confusing jurors by diverting their attention to wholly collateral matters involving persons not on trial. See generally *id.* at 473-475.

A defendant may "show that crimes of a similar nature

---

[5]The coat was not introduced in evidence at this trial. Sometime after the second trial, through the fault of neither party, the coat was lost. Evidence regarding identification of the coat was given by having the witnesses testify to having identified the coat at a prior proceeding.

have been committed by some other person when the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed the crime." *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979), quoting *State* v. *Bock*, 229 Minn. 449, 458 (1949). If such evidence "is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." *Id.*, quoting *Holt* v. *United States*, 342 F.2d 163, 166 (5th Cir. 1965). The premises of such admissibility are relevance and lack of prejudice. Absent an abuse of discretion, the judge's decision in determining relevance and prejudice will not be reversed unless justice requires a different result. *Commonwealth* v. *Perito*, 417 Mass. 674, 685 (1994). *Commonwealth* v. *Scott*, 408 Mass. 811, 816 (1990).

In *Commonwealth* v. *Keizer*, *supra*, we concluded that such evidence should have been admitted because there were "substantial connecting links" between the robbery charged and another robbery in which the defendant could not have participated. *Id.* at 267. Not only did the two crimes share an identical modus operandi with several distinctive features, but the two robberies also had one common perpetrator (each robbery was by a team of three perpetrators). We also found distinctive a specific link between the identification testimony against the defendant and the identity of the perpetrators of the similar crime. *Id.* at 268 n.2 (only one witness could identify defendant, and same witness also identified common perpetrator of two crimes).

Unlike *Keizer*, Rosa offers only a few specific links between the look-alike and the crimes charged here. The look-alike has a criminal record with some history of violence, and lived in the neighborhood at the time of the killing. Rosa also cites one identification witness's testimony that the perpetrator might have been missing a tooth or had a space between the teeth on the right upper side and the fact that the alleged look-alike was missing a tooth. Without more, these are fairly common similarities that do not require the admission of evidence of similar crimes. See *Commonwealth* v. *Harris*, 395 Mass. 296, 300-301 (1985).[6]

Rosa further argues that on the facts of his case application

---

[6]Rosa also points to several more general similarities. The look-alike is allegedly closer than Rosa in height and weight to the original descriptions

of the *Keizer* test, requiring great similarity in the characteristics of the crimes, should be relaxed. *Commonwealth* v. *Brusgulis,* 406 Mass. 501, 506 & n.7 (1990) (use of evidence of similar crimes by defendant, rather than government, reduces but does not eliminate possibility of prejudice). The only person who misidentified the look-alike here is Rosa's attorney, who has no particular connection to the crimes charged. Nevertheless, misidentification by a person unconnected with the crime, perhaps someone who is very familiar with the defendant, may be enough to bring such evidence within a judge's discretion to admit it. In some cases the similarity of appearance might be so striking that we would require admission of the existence of a look-alike. This is not such a case. The instances in which we have required the admission of look-alike or third-party similar offense evidence have involved crimes with substantial similarities and some connection between the identification witnesses and both crimes. See *Commonwealth* v. *Jewett,* 392 Mass. 558, 563 (1984) (defendant misidentified as perpetrator of similar crime; victims of both crimes made identification in the same manner, from the same photograph); *Keizer, supra* at 268 n.2; *Commonwealth* v. *Franklin,* 366 Mass. 284, 286-291 (1974) (victims identified two perpetrators, including defendant, but later admitted that they mistakenly identified one of the men); *Commonwealth* v. *Murphy,* 282 Mass. 593 (1933) (witnesses to proffered similar crimes had misidentified defendant as perpetrator of those crimes). We cannot say that a judge's excluding such evidence is an abuse of his discretion when an uninvolved person mistakes a third party for the defendant

of the perpetrator given to the police at the time of the abduction. That the look-alike is a light-skinned African-American, that Rosa is Hispanic, and that the two share the same eye and hair color, is claimed to account for the possible misidentification. The judge looked at photographs of Rosa and the look-alike and concluded that they were not strikingly similar. Skin color and height are mere common similarities. Nothing that Rosa offers, either in the method of the look-alike's prior crimes or the look-alike's appearance, comes close to demonstrating so striking a similarity that would cause us to reverse a judge's discretionary ruling.

Indeed, here the witnesses affirmatively identified the accused's face, not merely general characteristics. See *Commonwealth* v. *Harris,* 395 Mass. 296, 300-301 (1985) (similarities do not suffice where they are not particularly distinguishing or unique).

and the alleged alternate perpetrator did not commit any strikingly similar crimes.[7]

As for the centrality of identification to Rosa's defense, it appears that misidentification was not Rosa's only defense. Nevertheless, it is true that the main defense was misidentification; even so, having only a single defense to a criminal charge does not vitiate the requirement of relevance. The initial determination that proffered evidence has any relevance can only lie within the sound discretion of the judge. See *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984). Beyond that preliminary judicial finding lies the jury's traditional province, the weight of the evidence. When prejudice, including confusion of the jury, is possible, the judge must weigh the probative value of the evidence against such danger. Here the judge's determination that neither the crimes nor the look-alike was similar was not an abuse of discretion.

2. *Instructional error affecting burden of proof.* The jury began their deliberations on the afternoon of the fifth day of trial, after receiving a lengthy charge from the judge. After the jurors had had the case for several hours the judge released them for the evening. Only fifteen minutes into their resumed deliberations the next morning, the jury sent a communication to the judge. They asked, "Could you please explain the types of evidence to us, also proof beyond a reasonable doubt, and also, how are we to use the evidence?" In response the judge gave a supplemental instruction.[8] The jury

---

[7]Although the case defendant cites, *State* v. *Kucki*, 483 N.E.2d 788 (Ind. Ct. App. 1985), is to the contrary, we note that all the cases cited therein (including *Commonwealth* v. *Jewett*, 392 Mass. 558 [1984]) mandating admission of similar-crimes evidence had facts with the sort of connection just discussed.

[8]In his initial charge, the judge had discussed circumstantial evidence in these terms:

"Circumstantial evidence is evidence not on the main fact at issue but evidence on other facts or circumstances so related to each other and the main fact to be proved that upon proof of a set of circumstances or other facts a connection is established and a jury may infer the existence of the main fact at issue.

"Circumstantial evidence depends on inferences which a jury may draw from the evidence before it. When a material fact is not proved by direct testimony and is left to be inferred by other facts or circumstances, a jury is at liberty to use its general knowledge in determining which inferences are reasonably drawn from the evidence.

deliberated for much of the rest of the day, ultimately returning the guilty verdicts as to murder in the first degree and kidnapping.

"Giving you an oversimplified example or two of the drawing of an inference, say if you are driving your car out here on the Southeast Expressway on a nice bright, sunshiny day in the middle of the summer and you're heading for Cape Cod and as you proceed along you happen to glance over in the inbound lanes coming back into town and you see eight or nine cars in a row pass you and they're soaking wet. Say you proceed another 500 or 800 yards down the road and you run into a rainstorm. You probably would draw the inference that those inbound cars got wet by going through that same rainstorm on that bright, sunshiny day. You were not there. You did not see it happen. You cannot resort to direct observations. But, from that little factual situation, you draw an inference that that is what occurred.

"You can draw inferences upon the evidence in this case just like you draw them under circumstances as I have just suggested to you or similar circumstances. You may draw reasonable and possible inferences from the information and data that is before you to determine the main fact at issue in the case.

"Circumstantial evidence to justify the inference of guilt must exclude to a moral certainty every other reasonable hypothesis except guilt. The facts must not only be consistent with and point to the defendant's guilt, but they must be inconsistent with innocence."

In response to the question of the jurors, the judge stated:

"As to the first part of your question, 'Explain the types of evidence,' there are two basic types of evidence in any case. Direct evidence and circumstantial evidence. Direct evidence is testimony from a person on the witness stand who testifies in response to questions, and that person is testifying from what they observed or experienced from personal observations or experience and what they saw or did, participated in and were involved in. *That testimony tends to prove the main fact at issue.*

"...

"We also have circumstantial evidence. *Circumstantial evidence is evidence not on the main fact at issue. It's on certain other facts or other circumstances that are so related to each other and to the main fact at issue that upon proof of those other facts or circumstances you may draw an inference the main fact in issue exists.*

"...

"I will give you an example of a picture puzzle. *Say you have a picture puzzle consisting of a thousand pieces all scattered all over the room and you take the task of taking those little pieces and lay them out on a desk like this and you start putting them together. You wind up with nine hundred and forty pieces and you are missing sixty. You haven't got them all. But you look down at that puzzle and you say, 'I don't need those sixty. I know what that whole picture is, even with its missing parts.'* I draw an inference that this figure here is a nose. I might be missing the tip of it and I might be

Rosa objected to the supplemental instruction immediately after the judge gave it.[9] Rosa asserts that the judge's example in the discussion of circumstantial evidence, describing a 1,000 piece puzzle with sixty pieces missing, impermissibly altered the government's burden of showing guilt beyond a reasonable doubt. This numerical example, Rosa says, was so vivid and prominent that it could have played a central role in a reasonable juror's understanding of the standard of proof and trivialized the concept of reasonable doubt.

In considering whether a charge lowers the criminal standard of proof, we consider the charge, taken as a whole, and assess the possible impact of the alleged error on the deliberations of a reasonable juror, i.e., whether a reasonable juror could have used the instruction incorrectly. *Commonwealth* v. *Torres*, 420 Mass. 479, 490-491 & n.10 (1995).[10] See *Com-*

missing the bridge of it, but I can look at that picture there and I know those missing parts because I draw an inference from my personal experience and knowledge and observations that that's what that figure is, even with the missing parts. It's a nose. *You look and you can say, 'I know that that picture puzzle if I had the other sixty pieces would portray a face.'* You draw an inference from some facts related to another issue. You take the ones you've got, and you draw an inference that something else exists. You do it every day." (Emphasis added.)

The judge then read, nearly verbatim, the charge from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850).

[9]Rosa advanced several arguments to the trial judge, but pursues only one here.

[10]Rosa's brief cites to *In re Winship*, 397 U.S. 358 (1970), and he argues that the numeric picture-puzzle example violated the Federal due process clause. Federal law finds error in jury instructions only with a "reasonable likelihood" that the jury did use an inappropriate standard. *Estelle* v. *McGuire*, 502 U.S 62, 72 n.4 (1991). *Boyde* v. *California*, 494 U.S. 370, 378 (1990).

Much of the modern jurisprudence of the beyond a reasonable doubt standard stems from *Commonwealth* v. *Webster, supra*, which itself rested on the common law of the Commonwealth. The reasonable-doubt standard has become incorporated into the Fourteenth Amendment to the United States Constitution. *In re Winship, supra* at 361-364. See also *Victor* v. *Nebraska*, 114 S. Ct. 1239, 1242 (1994). Since the Federal courts have clarified their "reasonable-likelihood" test for reviewing jury instructions, we have persisted in looking for possible misunderstandings by reasonable jurors. *Commonwealth* v. *Torres*, 420 Mass. 479, 490-491 & n.10 (1995). *Commonwealth* v. *Grant*, 418 Mass. 76, 84-85 (1994) (post-*Victor* case finding that a judge's misstatement of burden of proof "could not have" been misunderstood). *Commonwealth* v. *Galford*, 413 Mass. 364, 375 (1992), cert. denied, 506 U.S. 1065 (1993). *Commonwealth* v. *Beldotti*, 409 Mass.

*monwealth* v. *Sellon*, 380 Mass. 220, 233-234 (1980) (supplemental instruction to be read in light of entire charge). Rosa points, however, to the judge's choice of words in the supplemental circumstantial evidence instruction. The judge did not, as the defendant claims, trivialize the burden of proof; he did not tell the jury they could convict if they were only ninety-four per cent satisfied of the defendant's guilt. We are aware that to attempt to quantify proof beyond a reasonable doubt changes the nature of the legal concept of "beyond a reasonable doubt," which seeks "abiding conviction" or "moral certainty" rather than statistical probability. See *Commonwealth* v. *Sullivan*, 20 Mass. App. Ct. 802, 806 (1985), and cases cited. See also *United States* v. *Anglada*, 524 F.2d 296, 300 (2d Cir. 1975) (sticks missing from bundle of twigs was improper quantitative example). Compare *Victor* v. *Nebraska*, 114 S. Ct. 1239, 1247 (1994), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 315 (1979) (reasonable doubt concept is necessarily probabilistic but instruction should still "impress upon the factfinder the need to reach a subjective state of near certitude").

Given the close connection between circumstantial evidence instructions and reasonable doubt instructions, it is best for judges to avoid examples that have numeric or quantifiable implications.[11] Here, the jury asked three specific questions. The judge responded with a supplemental instruc-

553, 562 (1991). Cf. *Commonwealth* v. *Gagliardi*, 418 Mass. 562, 571 n.4 (1994), cert. denied, 115 S. Ct. 753 (1995) (post-*Victor* case finding that judge's instructions could not have been read as suggesting improper standard of proof). Our case law is more favorable to a criminal defendant than the Federal standard.

[11]The original charge in *Webster* itself demonstrates the close link between circumstantial evidence and reasonable doubt instructions. Chief Justice Shaw's circumstantial evidence instruction is replete with references to the burden of proof and the classic phrase "moral certainty." *Webster*, *supra* at 313, 316, 318-320. The *Webster* charge on reasonable doubt is, looked at in context, the summary and conclusion of the circumstantial evidence discussion, not a separate topic. See *id*. at 320.

Circumstantial evidence instructions often include examples that adequately demonstrate the qualitative concept of a missing link in a chain of inferences. See, e.g., *id*. at 312 (footprints in the snow). Cf. *Dirring* v. *United States*, 328 F.2d 512 (1st Cir.), cert. denied, 377 U.S. 1003 (1964) (inference from circumstantial evidence akin to identifying subject of a jigsaw puzzle with pieces missing, but no numeric figure stated). Indeed, the judge here used several proper examples before the penultimate quantification of pieces missing from a puzzle.

tion in three parts, each distinct. In his supplemental charge, as well as in the original instruction, the judge read the *Webster* charge on reasonable doubt. The jury in this case were quite discerning — they convicted on some counts and acquitted on another, and distinguished between theories and degrees of murder. It is at best purely speculative to think that the jury were misled as to their responsibility to find proof beyond a reasonable doubt.

We ordinarily presume that a jury follow all of their instructions. *Commonwealth* v. *Albert*, 391 Mass. 853, 859 (1984) (judge need not repeat a given instruction every time some confusion might result within the charge). The judge used entirely correct charges on circumstantial evidence and reasonable doubt in the main charge. The judge also followed the alleged picture-puzzle error in the supplemental instruction with a recitation of the time-tested instruction from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), along with several more recent formulations of the concept of reasonable doubt. The *Webster* instruction carries great weight, and conveys to the jury the proper solemn consideration and degree of certitude. *Commonwealth* v. *Beldotti*, 409 Mass. 553, 562 (1991). Its presence can provide adequate explanation of other facets of an instruction that by themselves might be considered erroneous, especially when *Webster* is the last thing a jury hear. Compare *Commonwealth* v. *Pickles*, 393 Mass. 775, 778-779 (1985) (plain statement that burden of proof lay with defendant, with no subsequent correct charge, constitutes error) with *Beldotti, supra* at 562 (statement that in isolation might shift burden of proof not error when followed by *Webster* charge) and *Commonwealth* v. *Beverly*, 389 Mass. 866, 871-872 (1983) (technical language that alone would reduce standard of proof, preceded and followed by correct language on standard of proof, not error). Thus, construing the supplemental and main charges together, a reasonable juror would have separated the circumstantial evidence instruction from the entirely correct, and subsequently given, definition of reasonable doubt. A reasonable juror could not have convicted Rosa using a lowered standard of proof.

3. *Instructional error affecting degree of murder.* Rosa's appellate counsel makes two allegations of error in the jury instructions setting out the requirements for a conviction of murder in the first degree. Because trial counsel did not object

on these grounds, we look only for a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E.[12]

The judge charged the jury on all three theories that could support a conviction for murder in the first degree: premeditation, extreme atrocity or cruelty, and felony-murder. The judge also gave instructions on two alternative underlying felonies that would support the felony-murder theory: aggravated rape (during a kidnapping) and kidnapping with intent to extort. The jury rested their verdict on a finding of extreme atrocity or cruelty and, in the alternative, a finding that Rosa committed the predicate felony of aggravated kidnapping. Because we conclude the instruction on murder in the first degree by extreme atrocity or cruelty was not erroneous, we need not discuss the second theory of conviction. See *Commonwealth* v. *Judge*, 420 Mass. 433, 444 (1995); *Commonwealth* v. *Burke*, 414 Mass. 252, 267 (1993).

Rosa first points to the judge's instruction defining extreme atrocity or cruelty.[13] Citing *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994), Rosa contends that the instruction

---

[12]We have considered such error, like error in a reasonable-doubt instruction, as capable of producing a miscarriage sufficient to warrant relief under § 33E. See *Commonwealth* v. *Torres*, *supra* at 483-484, 486-488 (claimed error in malice instruction evaluated under § 33E); *Commonwealth* v. *Skinner*, 408 Mass. 88, 92, 96 (1990) (verdict set aside for improper premeditation instruction).

[13]The judge charged the jury on this score as follows:

"Now, this brings me to first degree murder on the theory of extreme atrocity or cruelty. In order to prove the defendant guilty of first degree murder committed with extreme atrocity or cruelty, the Commonwealth must prove three elements beyond a reasonable doubt. One, the defendant committed an unlawful killing; two, that the killing was committed with malice aforethought; and three, that the killing was committed with extreme atrocity or cruelty, either/or.

"I explained the first two elements to you just a minute ago. I have explained what an unlawful killing was, and I have explained what malice aforethought was.

"The third element on this theory which must be proved to you beyond a reasonable doubt before you can deliver a guilty verdict on this theory of first degree murder is that the killing was committed with extreme atrocity or cruelty. Extreme atrocity or cruelty means the Commonwealth must prove that the defendant caused the person's death by a method that surpassed the cruel[ty] inherent in the taking of any human life. It must surpass that.

"When making this decision as to this element of extreme atrocity or cruelty, *you may consider a number of factors. These include and are not*

here told the jury to consider extraneous and undefined factors, and were therefore impermissibly vague. See *Commonwealth* v. *Freiberg*, 405 Mass. 282, 289-290, cert. denied, 493 U.S. 940 (1989); *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-228 (1983) (listing factors that jury may consider in finding extreme atrocity or cruelty).

Unlike *Hunter* the judge here subsequently referred to the jury's consideration of "these factors" and the "factors previously stated." This portion of the charge concluded with an imperative to the jury that "if these factors have been proved to you beyond a reasonable doubt." A reasonable juror would not have understood the "extreme atrocity or cruelty" portion of the charge to allow consideration of external factors. Compare *Hunter, supra* at 837 (instruction that "extreme atrocity or cruelty is not limited to [the *Cunneen* factors]" erroneous). Repeated reference to specific factors put the

*limited to the following.* One, whether the defendant was indifferent to or took pleasure in the victim's suffering; two, the consciousness and degree of suffering of the victim; three, the extent of the victim's injuries; four, the number of blows or the manner in which the blows or the trauma was administered; five, the manner and force with which the blows were delivered—I think I'm repeating myself—six, the size and nature of any weapon used; and, seven, the disproportion between the means needed to cause death and those employed. *Consider all of these factors, among others which you might want to consider,* on the issue of extreme atrocity or cruelty.

"You need not necessarily find that the victim suffered consciously, although you may consider this factor. You may also consider whether the defendant had knowledge of any pain caused to the victim, whether the defendant, the perpetrator, was indifferent to any such pain or whether any pleasure was derived from it.

"I instruct you that indifference to or knowledge of pleasure in a person's pain is cruelty. Extreme cruelty is only a higher degree of cruelty.

"You, as the jury, are representative of the conscience of the community. *You should determine based upon the factors previously stated* and the injuries inflicted whether this crime was committed with extreme atrocity or cruelty.

"Deliberate premeditation is not an element of murder with extreme atrocity or cruelty; but you must bear in mind malice aforethought, as I previously instructed you on.

"So, *if these factors have been proved to you beyond a reasonable doubt* and the identity of the defendant has been proved to you beyond a reasonable doubt, you are permitted and should find the defendant guilty of first degree murder with extreme atrocity or cruelty." (Emphasis added.)

emphasis on the *Cunneen* factors. The judge properly charged the jury. There was no error in the charge given.[14]

Having reviewed the entire record pursuant to our authority under G. L. c. 278, § 33E, we discern no other grounds to complain of a miscarriage of justice in this case. We therefore affirm the judgments of kidnapping and murder in the first degree.

*So ordered.*

---

[14]Rosa raises one additional point of error. Because Rosa voluntarily called the police after they came calling for him, he requested a "consciousness of innocence" instruction. The judge denied that request. Since Rosa's trial we have clarified that such instructions are not required. See *Commonwealth* v. *Oeun Lam*, 420 Mass. 615, 619-620 (1995), and cases cited. Trial counsel argued the point to the jury. We decline defense counsel's invitation to revisit the issue here.