NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13022

COMMONWEALTH  vs.  ANDREW MacCORMACK.


Suffolk.     November 7, 2022. - May 9, 2023.

Present:  Budd, C.J., Gaziano, Cypher, Kafker, & Georges, JJ.


Homicide.  Evidence, Prior misconduct, Third-party culprit,
    Inference, Consciousness of guilt, Inflammatory evidence,
    Relevancy and materiality.  Practice, Criminal, Capital
    case.



Indictment found and returned in the Superior Court
Department on October 31, 2017.

The case was tried before Mary K. Ames, J.


Stephen Paul Maidman for the defendant.
Sarah Montgomery Lewis, Assistant District Attorney (Ian
Polumbaum, Assistant District Attorney, also present) for the
Commonwealth.


GEORGES, J.  A Superior Court jury convicted the defendant

of murder in the first degree on a theory of extreme atrocity or

cruelty, see G. L. c. 265, § 1, in the killing of his wife,

Vanessa MacCormack, by blunt force trauma and strangulation.  On

appeal, the defendant argues that there was insufficient

evidence to support his conviction. He also contends that the police investigation focused exclusively on him, rather than pursuing other leads, and that the judge abused her discretion in permitting the introduction of certain evidence that the defendant argues was used improperly as propensity evidence. In addition, the defendant asks us to exercise our extraordinary authority under G. L. c. 278, § 33E, to direct the entry of a verdict of not guilty or to order a new trial. Having carefully reviewed the record, we discern no error that would warrant vacating the conviction, or ordering a new trial, and no reason to grant relief under G. L. c. 278, § 33E.

1. Facts. We recite the facts the jury could have found, viewed in the light most favorable to the Commonwealth. Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

The defendant and the victim were married in August of 2015, and purchased a house in Revere a few months later. Both of their families lived nearby and were intimately involved in the couple's lives. At the time of the victim's killing in September of 2017, the defendant's mother was living with the defendant and the victim, as she had been since the previous April. Ordinarily, the defendant already would have left for work by the time his mother would wake up at 6 A.M. The victim was in daily contact with members of her family, calling and sending text messages to them multiple times a day, and to

family and friends, the victim and the defendant appeared to be happy.

Beginning in early 2017, however, issues arose stemming from the defendant's financial improprieties, which the victim suspected were to fund his growing use of drugs. In February 2017, the victim realized that approximately $6,000 had been taken from her bank account. Evidence at trial pointed to the defendant: he had forged and cashed at least two checks to himself, each for $350, from the victim's account, and there was no evidence of third-party access. That same month, the victim realized that her wedding ring was missing. The couple purchased a replacement, but it also went missing two weeks later. When the couple called police to investigate a potential robbery, officers found no signs of forced entry. The defendant mentioned to officers that the baby monitor had been "hacked," and a small basement window was open. Police determined that the window was too small for anyone to have entered through it. The second ring was never found.

The defendant began frequenting local pawn shops, taking out loans on gift cards and other jewelry, including his wedding ring, and then defaulting on the loans. Unbeknownst to his wife, the defendant repeatedly opened, overdrew, and closed bank accounts throughout 2017. By the summer, the defendant was spending between $100 and $400 on cocaine and steroids weekly.

On July 28, 2017, the victim sent a text message to the defendant saying that he was ruining their marriage and that she was unhappy and furious.  The defendant tried to assure her that everything would be fixed, but the victim said that she knew the defendant was doing something suspicious, as she had seen a notification on his cellular telephone from someone she knew to be a drug seller, and the defendant had attempted to take out a loan without her knowledge.  The victim continued to send the defendant a series of angry and indignant text messages, full of profanity, throughout the night.  Text messages over the following month indicated that the victim's frustration with the defendant continued to grow.[1]

On August 31, 2017, the defendant and the victim got into another argument.  The victim sent a text message to the defendant saying that she was going to sell the house and find a

_____

[1] Among other things, the victim sent the defendant a text message saying, "I'm furious.  You are ruining this marriage.  It's not fair.  I'm unhappy in this marriage because of you.  You need to fix this."  In subsequent messages, she reiterated that the situation was not fair to her, she did not trust the defendant, she was "at the end of [her] rope in this marriage," and the defendant was "making [her] fucking miserable."

Over the course of the month, the victim, on separate occasions, sent the defendant messages saying that she was "so fucking mad," demanded detailed information about the defendant's whereabouts, said that she was "blind-sided" that he was not where she thought he had been, protested that she "thought [they] were trying to work on [their] marriage," and repeatedly asked about different sums of money that had gone missing from their joint account.

divorce lawyer and that she could not stop thinking about the possibility of divorce. The following day, the defendant responded that the victim was "crazy" and that he would not sign anything to sell the house or to obtain a divorce. On September 2, the victim continued to express her anger to the defendant in text messages, and the following day, she demanded answers from the defendant about times when she felt that he had lied to her, including instances of missing cash, mysterious bank withdrawals, and her missing credit card.

On September 8, 2017, the victim sent the defendant a message about additional money that was missing from their bank account, and accused him of creating their financial problems because of his drug habit and only saying he would improve things and repay her missing money in order to avoid a divorce. The next day, the victim again told the defendant that she was unhappy with him and their marriage. These later messages were in response to the defendant's accrual of hundreds of dollars in unpaid parking tickets for the victim's father's sport utility vehicle (SUV), which the defendant had been using regularly since February.

On September 22, 2017, the victim checked into her gym at 6:36 P.M. Later, after returning home, she had an audio-video call with her parents so they could say goodnight to her daughter. At 8:17 P.M., the defendant sent the victim a

photograph of his new haircut and they both called each other. At 8:58 P.M., the victim sent the defendant a text message asking where he was.

The defendant ultimately spent the evening in the basement of the house, where he intended to sleep. He devoted his time that evening to browsing Internet escort listings advertising sex for money.

a. Events of September 23, 2017. In the early morning hours of September 23, 2017, the defendant sent a text message to an escort and arranged to meet her at 10 A.M. on Route 1 in Peabody. He continued to peruse similar listings until after 3 A.M.

The defendant's mother testified that she left the house at around 8:30 A.M. At 8:28 A.M., surveillance camera footage showed the defendant driving toward a liquor store at the end of the street, circling it, and returning home at 8:35 A.M. During this brief trip, the victim called the defendant's cellular telephone twice.

Throughout the morning, the defendant made a series of telephone calls to his friend James Caruso, the first at around 10 A.M. Caruso lived in Saugus, which is north of Revere. Earlier that week, the defendant and Caruso had discussed the defendant going to Caruso's house to help finish some work on the house. Surveillance video footage and cell

site location information (CSLI) for the defendant's telephone showed that he did not leave his house again until 12:49 P.M., when he drove away with his daughter in the SUV. By that time, according to the medical examiner, the victim was dead. The defendant had killed the victim and left her body on the floor of their bedroom.

After leaving the house, the defendant called Caruso at 12:54 P.M. He told Caruso that he had taken the baby for a walk and was going to see if the victim was home from the gym before heading to Caruso's house. Approximately four minutes later, as he was driving south on Route 107 toward Revere, the defendant called the victim at 12:58 P.M., and the call went directly to voicemail.[2] He then sent the victim two text messages saying that he would be going to visit Caruso and asking why she was not responding, respectively. The defendant drove a meandering route through Revere, and then drove north on Route 107 toward Saugus; he arrived at Caruso's house, a five-minute drive from his own house, at 1:30 P.M.

As he was completing the work on Caruso's home, the defendant called his mother-in-law. He told her that the victim had not been home when he left the house and that she was

_____

[2] Other calls to the victim's cellular telephone that afternoon, from the defendant and from the victim's sister and parents, also went directly to voicemail.

probably at the gym. He said that he had been at Caruso's house for approximately one hour with the baby and would be leaving in about fifteen minutes. After ending the call, the defendant mentioned to Caruso that he had not heard from the victim since she left for the gym that morning. The defendant seemed concerned and said that it was unusual not to have heard from her, as the two usually spoke while the victim was at the gym. The defendant called his home telephone for six seconds, and then again called the victim's cellular telephone. The victim's mother called the defendant again at around 2:10 P.M.; he said that he was still at Caruso's house, and would be leaving in about twenty minutes.

The defendant left Caruso's house a few minutes later. He bought gasoline in Winthrop, drove to a pharmacy in the East Boston section of Boston, and then met his drug supplier in East Boston, where he purchased cocaine. The defendant took an indirect route back to his house in Revere, approaching it from Saugus to the north, rather than from Caruso's house to the south. During the drive, he again spoke with his in-laws concerning the victim's whereabouts.

The victim's mother called the defendant again at around 3:30 P.M., as the defendant was pulling into his driveway. The defendant remained on the telephone with her as he parked and entered the house. Then he screamed, "Call 911. She's dead."

The victim's mother hung up and called 911.  When the defendant called the victim's mother again, he told her that the victim was "dead" and "cold."  The defendant picked up the baby, still in her carrier seat, and ran out of the house to call 911.

First responders found the victim in the couple's bedroom, lying face-down in a pool of blood, with a garbage bag partially full of trash over her head.  An autopsy later revealed that the cause of death had been a combination of blunt force trauma to the face, strangulation, and stab and slash wounds to the neck. Blood pooling indicated that she had been alive when some of the blunt force injuries and lacerations occurred, although the stab and slash wounds to the victim's neck were inflicted "pretty near death" or postmortem.

b.  The investigation.  That evening, police officers brought the defendant to the Revere police station for an interview.  There were no signs of bruising, scratches, injuries, or marks on the defendant's body.  The defendant described to the officers the course of his actions that day. He also said that he and the victim were "very happily" married and did not have any problems related to infidelity, drugs, or finances.  He explained that all of the doors had been locked when he left the house that morning and that he had had to use a key upon his return.  When the interviewing officers brought up the issue of the missing rings, the defendant suggested that the

second ring must have been stolen and said that police had found a "suspicious" window in the basement that was unlocked.

When police searched the defendant's and the victim's house, they found no signs of forced entry.  Blood spatter on the inside of the bedroom door, walls, closet doors, and bedframe also showed no signs of a struggle.  The bathroom appeared to have been cleaned recently, and the television and other surfaces had been wiped down.  The bed linen had been removed and was in a laundry basket, but contained no trace of blood.  A large butcher knife was missing from the knife block in the kitchen, and there was no bag in the kitchen garbage container.  There was an overwhelming odor of bleach throughout the house.  The investigation uncovered no useful fingerprints or deoxyribonucleic acid.

A forensic examination of the defendant's cellular telephone revealed that he had deleted several items from it shortly after the victim's death.  Those items included Internet browsing history of visits to an escort Web site, and several text messages in which the defendant attempted to arrange a meeting with an escort, in the week leading up to the victim's death and in the early morning hours of September 23, 2017.

c.  <u>Prior proceedings</u>.  The grand jury indicted the defendant on one count of murder in the first degree.  At trial, the Commonwealth proceeded on theories of deliberate

premeditation and extreme atrocity or cruelty.  The defendant maintained a defense that the Commonwealth's evidence did not establish him as the killer beyond a reasonable doubt.  He called two witnesses to testify for the defense.  His mother testified to his former drug use and the time he spent in drug rehabilitation.  Thomas Riley, who knew the defendant from playing in a local hockey league, testified that the defendant had given him a ride that afternoon.  The judge denied the defendant's motions for a required finding of not guilty at the close of the Commonwealth's case and at the close of all the evidence.  The jury convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty.

2.  <u>Discussion</u>.  The defendant argues that there was insufficient evidence to support a finding that he was the perpetrator and that, thus, his motions for a required finding should have been allowed.  Specifically, the defendant asserts that the Commonwealth's case rested on improper speculation about his character and that the prosecutor did not introduce evidence that affirmatively demonstrated that the defendant had committed the crime.

a.  <u>Sufficiency of the evidence</u>.  In reviewing the denial of a motion for a required finding of not guilty, we consider whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt. See Commonwealth v. Latimore, 378 Mass. 671, 678 (1979), citing Jackson v. Virginia, 443 U.S. 307, 318-319 (1979). "The relevant question is whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." Commonwealth v. Brown, 401 Mass. 745, 747 (1988). Circumstantial evidence is competent to establish guilt beyond a reasonable doubt, Commonwealth v. Nadworny, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986), and the reasonable inferences drawn from such evidence "need not be necessary or inescapable," only "reasonable and possible" (citation omitted), Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). At the same time, a conviction may not rest on the piling of inference upon inference or on conjecture and speculation. Id.

Here, the jury reasonably could have found that it was the defendant, and not a third-party culprit, who committed the murder, where the evidence supported an inference that the defendant was the only person in the house with the victim and their baby during the relevant time frame. Video surveillance footage showed the defendant driving away from the house in the SUV at 12:49 P.M.; that is the first time the defendant appears on surveillance footage near his street after he was shown returning home at 8:35 A.M.

Moreover, the prosecutor introduced sufficient evidence from which the jury reasonably could have found that the defendant was alone with the victim, because there was no evidence that anyone else was present in the house at that time.[3] Cf. Commonwealth v. Coonan, 428 Mass. 823, 829 (1999) (evidence showing that victim and defendant were together at time of killing, in conjunction with other incriminating evidence, was sufficient to support conviction). The defendant told police, the victim's mother, and Caruso that the victim intended to go to the gym that morning. CSLI evidence, however, indicated that the victim's telephone had been at her house all morning, as did testimony from employees of the victim's gym asserting that her last visit to the gym had been the previous evening. The defendant's mother testified that she left the house at around 8:30 A.M, and the victim's mother and father testified that they were out of town that day. No evidence was introduced to suggest that any other person had entered the house; given the

_____

[3] Testimony by a paramedic who responded to the 911 call indicated that in her opinion, the victim had been dead for at least two to three hours based on the state of rigor mortis in the victim's jaw when first responders arrived at the scene shortly after 3:30 P.M. The jury later heard testimony from a State medical examiner that there was no certain way to establish a time of death from rigor mortis, nor a current reliable formula to establish the precise time of death from temperature. If the jury credited the paramedic's testimony, drawing all inferences in the Commonwealth's favor, the victim would have been dead when, as the surveillance video footage indicated, the defendant left the house at 12:49 P.M.

locked doors and windows, the jury reasonably could have concluded that no one had done so.  The jury thus could have discredited the defendant's version of events and found instead that the victim had remained home that morning and that the defendant was the only one there with her and the baby after the defendant's mother left the house.  See Commonwealth v. Lopez, 484 Mass. 211, 217 (2020) (jury may credit or reject some, part, or all of particular witness's testimony).

In addition, the prior bad act evidence that the defendant challenges, which was introduced to show the nature of his and the victim's prior relationship, was properly before the jury as evidence of consciousness of guilt.  Evidence of consciousness of guilt, while not conclusive, may be considered in conjunction with other evidence to establish guilt beyond a reasonable doubt.  See Commonwealth v. Woods, 466 Mass. 707, 715, cert. denied, 573 U.S. 937 (2014), S.C., 480 Mass. 231, cert. denied, 139 S. Ct. 649 (2018), citing Commonwealth v. Rojas, 388 Mass. 626, 629 (1983).  Such evidence may include making false or inconsistent statements to police and giving a false alibi. Woods, supra.  See Rojas, supra at 629-630.

As discussed, quite a few of the defendant's statements about his location and activities on the day of the crime were inconsistent with other evidence introduced at trial.  In his statement to police, the defendant said that he went to the

beach at around 12:30 P.M. with his daughter, and then stopped at a pharmacy and a gasoline station, before he headed to Caruso's house at around 2 P.M. The defendant also stated that after leaving Caruso's house, he drove directly home, where he discovered the victim's body. Riley testified that he saw the defendant at the beach in East Boston that afternoon and said that the defendant had given him a ride to a liquor store.

The jury, however, reasonably could have inferred that the images on the surveillance footage, and the CSLI records, reflected the defendant's actual location. The CSLI and telephone records suggested that the defendant had remained at his house until 12:49 P.M., not 12:30 P.M. Video surveillance footage then showed the defendant driving around Revere and Saugus, in a direction away from his and Caruso's houses, for approximately forty minutes. Additional footage showed the defendant leave Caruso's house and drive to a pharmacy and a gasoline station before going to East Boston to purchase cocaine. The jury could have inferred from the CSLI and video surveillance footage that the defendant returned home from East Boston using a deliberately circuitous route, in order to delay his report of having found the victim dead in their house.[4]

---

[4] CSLI from that period was consistent with the defendant's route as seen in the surveillance footage.

In his statement to police, the defendant repeatedly emphasized how concerned he was about the victim and that he had communicated his concern to others throughout the day. In the defendant's concerned calls to the victim's telephone, his statements to Caruso, and his meandering drives, the jury reasonably could have inferred that the defendant was attempting to orchestrate a timeline that placed him away from the house at critical moments and provided a way for him to express concern for his wife. See Commonwealth v. Fitzpatrick, 463 Mass. 581, 594 (2012) (defendant's fabricating alibi by parking truck in driveway so it would be visible, and recounting false series of events to police, was consistent with consciousness of guilt).

Additionally, Kimberly Donovan, a friend of the victim's mother, testified that she gave the defendant a ride to the victim's parents' house on the evening of the killing. During that ride, the defendant insisted to Donovan, without prompting, that investigators had asked him repeatedly about the presence of bleach in the house in efforts to "trick" him. During that interview, however, the officers deliberately had not mentioned bleach. Here, too, the jury reasonably could have inferred that the defendant's non sequitur protestations to Donovan that the police were trying to "trick" him were intended as an attempt to fabricate sympathy and protest his innocence.

The defendant also repeatedly told police that he and the victim were "very happily" married, had no financial difficulties, and were faithful. From the victim's text messages, testimony by the defendant's friends and members of the victim's family, and content on the defendant's cellular telephone, however, the jury could have determined that the relationship was quite different from what the defendant described. The jury heard evidence from which they could have concluded that the defendant was buying and using drugs, had stolen money, jewelry, and credit cards from the victim, and had sought to exchange money for sex with escorts. The victim's text messages suggested a degree of frustration with, and anger at, the defendant to such an extent that she was contemplating obtaining a divorce.

The forensic investigation of the defendant's telephone indicated that he had deleted certain text messages and browsing history from his telephone that portrayed him in an unflattering light, detailed his efforts to find escorts, including hours before the victim's death, and showed contentious discussions between the victim and himself concerning financial difficulties. The jury could have understood these deleted telephone records as a willful attempt at concealment, and as evidence of the defendant's consciousness of guilt. See, e.g., Commonwealth v. Gilbert, 423 Mass. 863, 869-870 (1996), S.C.,

447 Mass. 161 (2006) (defendant's repeated denial of serious difficulties between couple in face of consistent evidence to contrary was evidence of his consciousness of guilt).  While such evidence by itself would be insufficient to sustain a conviction, it may be considered as part of the "mosaic of evidence" upon which the jury could have concluded that the Commonwealth had met its burden of proof beyond a reasonable doubt.  See Commonwealth v. Javier, 481 Mass. 268, 284 (2019), quoting Commonwealth v. Salim, 399 Mass. 227, 233 (1987).

And although the Commonwealth need not prove motive for a conviction of murder in the first degree, evidence of a defendant's motive may be relevant and admissible, as it was here, to show that the defendant intended and acted as argued. See Commonwealth v. Carlson, 448 Mass. 501, 508-509 (2007).

The jury heard multiple types of evidence from which they reasonably could have inferred that the defendant had a motive to kill the victim.  Text messages from the victim, as well as police testimony, indicated certain underlying reasons for the increasingly fraught relationship between the defendant and the victim and the growing animosity the victim directed at the defendant.  This evidence, among other things, showed that the defendant forged and cashed two checks from the victim's accounts, repeatedly opened and closed bank accounts, was dishonest about having paid parking tickets, pawned his wedding

ring and household gift cards, and caused the disappearance of the victim's two wedding rings, in the victim's view, to support his drug habit. The defendant also repeatedly told the victim that their bank accounts had been hacked, notwithstanding the absence of any evidence indicating that this had occurred. See Commonwealth v. Tassinari, 466 Mass. 340, 347 (2013) (victim's statements expressing dissatisfaction with marriage and hopes for divorce were relevant to defendant's motive); Commonwealth v. Mendes, 441 Mass. 459, 464-465 (2004) (evidence of husband's financial irregularities, use of cocaine, and consorting with prostitutes established existence of strained marital relationship as possible motive for killing).

The victim told the defendant multiple times that she was thinking of divorcing him. Each time, the defendant responded that he did not want the marriage to end, apologized, and promised that he would do better. See Lao, 443 Mass. at 780 (defendant's knowledge of termination of marriage was evidence of motive); Commonwealth v. Lodge, 431 Mass. 461, 463 (2000) (evidence showing deteriorating relationship between victim and defendant in year prior to murder was probative of motive).

b. Defendant's arguments. The defendant argues that the Commonwealth's case was based on attacking his character and speculation about his behavior in the months leading up to the victim's death, rather than on any direct evidence that he had

played a role in the killing.  The only way he could have been convicted, the defendant contends, is if the jury failed to presume him innocent while weighing the evidence, in violation of his right to due process.  He argues that because the Commonwealth did not demonstrate to the jury that it ruled out other suspects and lacked direct evidence that he had played a role in the killing, his conviction cannot stand.

The theory of the defense at trial, consistent with the defendant's statement to police, was that the defendant was not at home at the time of the killing.  In his statement to police on the evening of the victim's death, the defendant said that he had slept in the basement the previous night.  According to the defendant, the victim woke him up at around 9 A.M. with the baby, and his mother left the house at approximately 9:30 A.M. At 11:30 A.M., the victim told him that she wanted to go to the gym.  He told the victim he would take the baby for a walk and then go to Caruso's house.  The victim was still at home when the defendant left at 12:30 P.M. and took the baby in her stroller to the beach.  When he got to the beach, he contacted Caruso to arrange his visit.  The defendant showed the officers his cellular telephone, which indicated that he had tried to call the victim and had sent her a text message at 12:59 P.M.

The jury reasonably could have rejected the defendant's account.  The absence of any sign of entry by anyone else, the

locked doors, the lack of any means of alternate entry, and the absence of any struggle by the victim, in conjunction with the testimony, video surveillance footage, and CSLI, discussed supra, would have allowed a reasonable juror to infer that the defendant had not been where he claimed he had been at the time of the killing. Rather, he and the victim had been alone with their daughter in the house at the time of the victim's death. See Commonwealth v. Anderson, 396 Mass. 306, 311-313 (1985) (evidence that defendant was alone with victim at about time of murder, along with evidence of consciousness of guilt, was sufficient to sustain verdict); Rojas, 388 Mass. at 629-630 (same).

The defendant's argument that the Commonwealth improperly relied on solely circumstantial evidence also fails. When reviewing sufficiency of the evidence, we "must look at the evidence as a whole and not examine exhaustively each piece of evidence separately." Salim, 399 Mass. at 233. Each inference drawn from the evidence must be a reasonable and logical conclusion, and the jury may not rely upon conjecture, guesswork, or speculation to choose between alternate inferences. See Commonwealth v. Dostie, 425 Mass. 372, 376-377 (1997). Thus, where the Commonwealth's evidence is entirely circumstantial, it cannot meet its burden if the evidence equally supports inconsistent propositions, as resolution of

such a case necessarily requires conjecture or surmise.  See, e.g., Commonwealth v. Merry, 453 Mass. 653, 663 (2009).

The case before us, however, is not one of equally inconsistent propositions, as there was no evidence of a plausible culprit aside from the defendant.  See Merry, 453 Mass. at 663 (evidence did not equally support defendant's and Commonwealth's theories of crime).  Rather, the evidence would have supported an inference that the defendant and the victim were home alone with their infant daughter on the morning of the killing, and there was no evidence of a forced entry.  See Commonwealth v. Merola, 405 Mass. 529, 535 (1989).  From the inconsistencies between the defendant's statements and the record evidence of the location of his cellular telephone and the surveillance footage showing the location of the SUV, the jury reasonably could have inferred that the defendant's statements were false and represented an attempt to construct an alibi, demonstrating consciousness of guilt.  See Rojas, 388 Mass. at 629-630.  In addition, evidence was introduced of a troubled marriage, resulting from the defendant's financial improprieties, which coincided with his return to, and increasing use of, drugs.  There also was abundant evidence of the victim's escalating anger toward the defendant and her contemplation of leaving the marriage in the weeks and days leading up to her death.  See Fitzpatrick, 463 Mass. at 594.

While a conviction may rest entirely on circumstantial evidence, "[t]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" Commonwealth v. Sokphann Chhim, 447 Mass. 370, 377 (2006), quoting Latimore, 378 Mass. at 677. Here, no single inference the jury reasonably could have drawn would have been sufficient, in isolation, to establish guilt beyond a reasonable doubt. Combined, however, those reasonable inferences create a "fabric of proof" that is sufficient to warrant the jury's finding that the defendant was the person who killed the victim beyond a reasonable doubt. Rojas, 388 Mass. at 629-630. See Fitzpatrick, 463 Mass. at 594. As the defendant emphasizes, the evidence against him was wholly circumstantial. Nonetheless, it was not, as he contends, insufficient to warrant the jury's conclusion that he killed the victim. See Lao, 443 Mass. at 780.

The defendant also objects that the criminal investigation improperly focused on him to the exclusion of all others. The defendant moved in limine to introduce evidence that police improperly and immediately focused on him, and did not pursue any other investigative leads. The defendant argued that there was evidence of hostility between a boyfriend of the victim's sister and the victim's family; the boyfriend's telephone number

was stored in the mother's telephone under the moniker "asshole." At the time of the victim's death, the boyfriend lived a short distance away, on the same street as the victim. At a hearing on the motion, the defendant explained that the victim's family told investigators that when her family was trying to locate her on the day of her death, they looked at a map showing the location of all telephones enrolled in their family's cellular provider's plan. On that map, the victim's cellular telephone appeared in near vicinity to the boyfriend's telephone, suggesting that the two were close by. The defendant maintained that police should have investigated this individual further.

The defendant also argued in his motion in limine that police failed to investigate the hacking of the baby monitor. When they spoke to police after the victim's replacement wedding ring vanished, the defendant and the victim both mentioned that they had seen the motorized baby monitor moving as if it were being operated, but without either of them doing so. The defendant also mentioned the baby monitor in his statement to police. The judge allowed the defendant's motion to introduce both pieces of Bowden evidence, but declined the request for a Bowden instruction. See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980). At trial, the defendant attempted to suggest

the possibility of an unknown third-party culprit through cross-examination.

A defendant has a constitutional right to a defense and to present evidence that another may have committed the crime. See Commonwealth v. Alcantara, 471 Mass. 550, 559 (2015). Consequently, we afford such evidence wide latitude, insofar as it tends to show that another person had the motive, intent, or opportunity to commit the offense. Commonwealth v. Steadman, 489 Mass. 372, 383 (2022), citing Commonwealth v. Silva-Santiago, 453 Mass. 782, 800-801 (2009). Such evidence "must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative." Commonwealth v. Rosa, 422 Mass. 18, 22 (1996).

Information concerning a third-party culprit whose existence was known to police, but whose potential involvement was never investigated, may be admissible in order to defend against a criminal charge by suggesting the existence of other possible culprits whom police did not investigate. See Silva-Santiago, 453 Mass. at 802; Rosa, 422 Mass. at 22.

Here, as the defendant concedes, although his motion in limine regarding Bowden evidence was allowed, he did not present any evidence at trial that a specific third-party culprit

existed.[5]  The Commonwealth was not required to prove that no one else possibly could have killed the victim.  See Merola, 405 Mass. at 533, citing Commonwealth v. Casale, 381 Mass. 167, 175 (1980).  The Commonwealth's burden was to prove that there was sufficient evidence for the jury to find, beyond a reasonable doubt, that the defendant had done so.  See Latimore, 378 Mass. at 677.  They have done so here.

Finally, the defendant argues that the judge abused her discretion in allowing the introduction of evidence that, during the evening before the killing, the defendant spent several hours browsing websites advertising escort services, scheduled a meeting with an escort, and sent an explicit photograph of himself to her (escort evidence).  The defendant maintains that the admission of the escort evidence resulted in overwhelmingly unfair prejudice that was disproportionate to its limited probative value.  By associating him with a website that he describes as "the most infamous illicit sexual marketplace in America," the defendant contends, the prosecution improperly played on the jury's emotions and caused them to conclude that he was capable of killing his wife.  He argues that the escort evidence was not probative, because it was not logically related

---

[5] No evidence regarding the victim's sister's boyfriend or the family's view of him was introduced at trial, nor did the jury hear any specific evidence concerning the absence of any investigation of the baby monitor.

to the crime charged and, to the extent that it suggested marital strain, it was cumulative of other evidence. The defendant also argues that any limiting instructions would have been ineffective, as the evidence left the jury to conclude that he was deceitful. As a result, he contends, the jury must have inferred, based only on his "sinister" behavior, rather than on any direct evidence, that the defendant was the killer.

Evidence of a defendant's prior bad acts may not be introduced to show the defendant's bad character or propensity to commit the crimes charged. See Commonwealth v. Da Lin Huang, 489 Mass. 162, 173 (2022), citing Commonwealth v. Helfant, 398 Mass. 214, 224 (1986); Mass. G. Evid. § 404(b)(1) (2022). Such evidence may be admissible, however, for other purposes, such as to establish motive, state of mind, or intent. See Commonwealth v. Crayton, 470 Mass. 228, 249 (2014); Mass. G. Evid. § 404(b)(2). Even where relevant for a permissible purpose, such evidence is inadmissible if its probative value is outweighed by the risk of unfair prejudice to the defendant. See Crayton, supra at 249 n.27; Mass. G. Evid. § 403.

Evidentiary rulings on relevance, probative value, and prejudice are left to the sound discretion of the trial judge. See Commonwealth v. West, 487 Mass. 794, 805 (2021). A judge's decision to permit the introduction of prior bad act evidence will be upheld unless the judge made a clear error of judgment,

such that the decision falls outside the range of reasonable alternatives.  Id. at 805-806.  When assessing whether the risk of unfair prejudice outweighs the probative value of the challenged evidence, a reviewing court considers, inter alia, (1) whether the trial judge carefully weighed the probative value and prejudicial effect of the evidence to be introduced; (2) whether the judge mitigated the prejudicial effect through proper limiting instructions; (3) whether the challenged evidence was cumulative of other properly admitted evidence, thereby reducing the risk of any additional prejudicial effect; and (4) whether the challenged evidence was so similar to the charged offense that it increased "the risk of propensity reasoning by the jury."  Da Lin Huang, 489 Mass. at 174, quoting West, supra at 807.

Here, the judge initially denied the Commonwealth's pretrial motion to introduce the escort evidence because she found that its probative value was outweighed by the risk of unfair prejudice; she also allowed the Commonwealth to renew its motion as the evidence before the jury developed.  When the Commonwealth again sought to introduce the escort evidence on the ninth day of trial, the judge again denied the motion, but allowed the Commonwealth to resubmit it based on the state of the evidence introduced.  After the Commonwealth filed a subsequent renewed motion following the introduction of the

defendant's statement to police, and having reviewed the transcript of that statement, the judge found that the escort evidence bore on the defendant's motive and state of mind. The judge commented that the defendant's assertion that the marriage had been happy was the "tipping point" and concluded that the escort evidence was more probative than unfairly prejudicial, based on the defendant's "repeated remonstration[s]" of how happy the marriage was, in conjunction with the remainder of the evidence.

The judge then undertook efforts to limit any possible unfair prejudice to the defendant. When the escort evidence was introduced, the judge instructed the jury on the "very, very, very circumscribed" way that they could consider the evidence: "on the very limited issue of motive of the defendant and [the] defendant's state of mind." The judge also required the prosecutor to redact the explicit photograph and the substance of the escort websites so that the jury's attention would not be drawn to the redactions. The judge reiterated the limiting instruction in her final charge.

Given the juxtaposition of the defendant's statements of happiness and his efforts in the hours before his wife's death to meet with an escort, there was no abuse of discretion in the judge's decision to permit the introduction of the challenged evidence after concluding that the risk of unfair prejudice was

outweighed by the probative value of the evidence.  At several different times, after considering the totality of the evidence that had been presented to that point in the trial, the judge had denied the motion.  See Commonwealth v. Peno, 485 Mass. 378, 394 (2020) ("A record of the thoughtful weighing of the risks of unfair prejudice . . . may indicate a reasonable exercise of discretion").  It was only after the defendant's statement to police was introduced that the judge found that the balance had shifted.  Evidence that a defendant has sought out an extramarital relationship also may form the basis of a finding that the defendant entertained feelings of hostility toward his or her spouse.  See Commonwealth v. DeMarco, 444 Mass. 678, 683 (2005).  Such inferences are permissible where the potential adultery is not too remote in time from the killing.  Id. at 682.  See Mendes, 441 Mass. at 465 (defendant's history of spending money on drugs and prostitutes was probative of deterioration of marital relationship).

Without the challenged evidence, at a minimum, the jury would have lacked context about the defendant's state of mind in the hours before the killing, and could have concluded that the killing was "an essentially inexplicable act of violence." Mendes, 441 Mass. at 464, quoting Commonwealth v. Bradshaw, 385 Mass. 244, 269 (1982).  The judge's decision to allow introduction of the evidence, for limited purposes and with a

clear, contemporaneous limiting instruction, was not outside the "range of reasonable alternatives."  <u>West</u>, 487 Mass. at 805-806.

c.  <u>Review under G. L. c. 278, § 33E</u>.  Having carefully reviewed the entire record, we discern no reason to exercise our authority to grant extraordinary relief under G. L. c. 278, § 33E.

<u>Judgment affirmed</u>.